# CASES

IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

## Dorsey *against* Dorsey.

Although the original domicil and marriage of the parties may have been in Pennsylvania, her courts have no jurisdiction of a cause of divorce alleged to have been committed by the husband whilst his domicil was in another state.

The law of the actual domicil at the time and place of the injury, is the rule in cases of divorce, for every thing but the original obligation of marriage.

APPEAL from the order of the common pleas of *Fayette* county, dismissing, for want of jurisdiction, a libel by a wife praying to be divorced from the bond of matrimony for wilful and malicious desertion. The libel charged that the parties were married in July 1823, and that they lived together till July 1827, when the husband absconded. It appeared by the proofs, that they were born, brought up and married in Pennsylvania; and that they went to reside permanently in Jefferson county, Ohio, where they were domiciled at the time of the desertion, which was fully proved. The wife shortly afterwards returned to her friends in Pennsylvania, where she had resided several years at the exhibition of her libel. It appeared, also, that the law of Ohio, as well as that of Pennsylvania, authorizes a divorce for desertion.

The cause was argued here by

VII.—2 E*

*Veech, Dawson* and *Austin,* for the appellant, who cited, 2 *Kent's Comm.* 95; 2 *Chase's Ohio Stat.* 1408; 3 *Chase's Ohio Stat.* 1581; and by

*M'Kennan,* for the appellee.

The opinion of the Court was delivered by

Gibson, C. J.—If the court below had jurisdiction on any known principle, it is that of the *lex loci contractus.* The marriage was celebrated in Pennsylvania; the parties were native inhabitants of Pennsylvania; and it was not long before the desertion that they had acquired a domicil in Ohio. The appellant again resides in Pennsylvania, but her husband does not; and if her domicil of origin could be an effective ingredient in her case, she would be prevented from resuming it by the coverture which suspends her separate existence and makes his domicil hers. We have, then, the case of a marriage betwixt inhabitants of our own state, with a subsequent domicil elsewhere; and we have a petition by one of them to be divorced from the bond of matrimony for a conjugal wrong done when she was not under the protection of our laws, and by one who was not then, and is not yet, amenable to them.

In constructing our international law of divorce we naturally look for the materials of it in the jurisprudence of our ancestors, whose institutions are more congenial with our own than those of their continental neighbours, and whose process of forensic discussion is usually more exact; but we find an irreconcilable difference betwixt the decisions of the English and of the Scottish courts. The English judges acknowledge the legitimacy of no jurisdiction which is not founded on the law of divorce at the place of the marriage, if it be an English one; while the Scottish, in the other extreme, are willing to found theirs even on a temporary residence of the complainant in the country of the forum. Of the latter pretension I shall say little more than that it is, in truth, a usurpation of power to intermeddle in the domestic concerns of a neighbour. If a *bona fide* domicil, in the strictest sense of the word, were not essential to jurisdiction, there would be nothing to prevent the exhibition of a libel by a proctor, and without the presence even of the complainant. But the respondent's presence would be more essential still; for a sentence against one whose person was not subject to the jurisdiction would be void on the plainest principles of natural law. Moreover, it is not perceived how the presence of even both could confer jurisdiction of a cause of divorce which was not, in its inception, subject to the law of the forum. It seems to me, the fallacy in the reasoning of the Scottish judges, plausible though it be, consists in their assumption that divorce is a penalty every where impliedly annexed to a breach of the marriage contract; which, like a civil cause of action attendant on the person, may be enforced any where; thus forgetting that whether it be a penalty at all depends, not on the Scottish

[Dorsey v. Dorsey.]

law as an interpreter or an avenger, but on the law of the domicil, or else on the *lex loci contractus,* which exclusively furnishes the original conditions. The English doctrine, on the other hand, is not more reconcilable to our principle of finite allegiance; for, notwithstanding the doubt and manifest inclination of Doctor Lushington in Conway *v.* Beazley (3 *Haggard's Ec. Rep.* 369), I take it to be settled by Lolley's Case (1 *Russell & Ryan's Crim. Cas.* 236), sanctioned in Tovey *v.* Lindsay (1 *Dow's Rep.* 124) by the preponderating weight of lord Eldon's name, that the dissolution of an English marriage, for any cause whatever, can be effected, so as to be acknowledged in that country, only by English authority. It was, indeed, intimated in Conway *v.* Beazley, that the question of jurisdiction in Lolley's Case perhaps turned on the difference betwixt temporary and permanent residence; but the report certainly does not indicate it; and indeed the conclusion attained was an unavoidable consequence of the British tenet of perpetual allegiance. Though an English subject acquire a foreign character from a foreign domicil, insomuch as to be dealt with as an alien for commercial purposes—though he formally renounce his primitive allegiance and profess another; he is accounted but a sojourner while abroad, and England, by the dogma of her government, is his home and his country still. Holding this dogma, it would be strange did she tolerate foreign interference with his domestic relations within her pale. Insisting on jurisdiction of his person, absent or present, she necessarily regards an attempt to change any one of these as an invasion of her sovereignty; and in that aspect it cannot be denied that the matter is within her province and her power; for though the *status* of marriage be *juris gentium,* the institution is undoubtedly a subject of municipal regulation. And it is this perpetual allegiance to the country, its institutions and its laws—not an indissolubility of the marriage contract from the presumption, will and reservation of the parties—which is the root of the English doctrine. It truly assumes that marriage is contracted on the basis of the laws, and these forbid a British subject to dissolve it by the authority of any other country; but take away the law of perpetual allegiance, and you take away the foundation of the presumptive pledge not to submit the duration of it to foreign action. The law of the place is necessarily the law of the marriage for its primitive obligation; but, except on the principle of perpetual submission to its supremacy in all things, it is not the law of the contract for the determination of its solubility. Is, then, a rule thus founded adapted to the jurisprudence of a country whose law of allegiance is different, and whose asserted right of affiliation in respect to those whom it admits, on that ground, to its civil and political privileges—divorce among the rest, concedes the same right to every other country? Framed on the basis of this law, the contract implies no perpetuity of municipal regulation. While the parties remain subject to our jurisdiction the marriage is dissolvable only by our law; when they are

[Dorsey v. Dorsey.]

remitted to another, it is incidentally remitted along with them. And that consequence must ensue as well where they are remitted to a jurisdiction entirely foreign, as where they are remitted to that of a sister state; for whatever ultra-territorial force a sentence of divorce by a court of competent jurisdiction may have been thought to gain from the constitutional precept that the judgment of a state court receives the same faith and credit in every other state as in its own, nothing in the federal constitution or laws has been thought to touch the question of jurisdiction, and the members of the union therefore stand towards each other, in relation to it, as strangers. With what consistency then, would naturalized citizens be allowed our law of divorce, were the validity of a divorce by the law of domicil in a sister state disallowed because the marriage had not the same origin? Transfer of allegiance and domicil is a contingency which enters into the views of the parties, and of which the wife consents to bear the risk. By sanctioning this transfer beforehand, we consent to part with the municipal governance incident to it; but with this limitation, that we part not with the remedy for past transgression. Barber *v.* Root, 10 *Mass.* 265.   On any other principle, an offending husband might, by a change of domicil, elude the vigilance of the law; for I know not that the remedy would follow him, or that our law of divorce would be executed by a foreign tribunal even were it provided with the requisite means.   No country executes the bank-rupt laws of another, or takes notice of a foreign revenue law; and it was aptly said in Barber *v.* Root, that the law of divorce is rather a part of the criminal than the civil code, and that it applies not so much to the contract, as to the duties, standing and conduct of the parties in society.   It has been suggested that the validity of a foreign divorce for a cause sufficient by the *lex loci contractus*, though arising in the country of the forum, might be conceded by the English authorities, or that of any other country which assumes the prerogative of jurisdiction after emigration; but, consistently with their dignity, I see not how they could brook to have their peculiar laws executed by any power but their own.   It is in going far beyond this, and in taking cognizance of wrongs committed beyond the limits of its territorial jurisdiction, as was done in Utterton *v.* Tewsh, *Ferguson on Marr. and Div.* 55, where the desertion was in England, that the pretension of the Scottish court of sessions is most easily assailed. It follows on our own principle, however, that not only does juris-diction belong to the courts at the place of the domicil, but that the retribution must be meted by their measure.   The appellant's case, therefore, appertains to the authorities in Ohio.   The forum is there, and the law which declares the offence is there.   The *locus delicti* may not be there, but the injury was suffered there.   And it is con-clusive that the person of the transgressor was not subject to our jurisdiction at the time of the fact; for an attempt to bind him with-out it, or without hearing or notice, would be extravagant.   Such appears to be the law deducible from the nature of our political system;

[Dorsey v. Dorsey.]

and though the earlier American cases seem to have been decided on local enactment, the doctrine here attempted to be reasoned out on principle is fortified by precedent in Barber *v.* Root, already quoted ; Hanover *v.* Turner, 14 *Mass.* 230 ; Jackson *v.* Jackson, 1 *Johns.* 424, and Borden *v.* Fitch, 14 *Johns.* 121.   Our own statute declares that " no person shall be entitled to a divorce who is not a citizen of the state, and who has not resided therein one whole year previous to the filing of his or her petition or libel"—a provision manifestly intended to prevent a surreptitious use of the remedy.   On general principles of law applicable to our condition, and in conformity to the spirit of our statute, the sum of the matter seems to be, that the law of the domicil at the time and place of the injury is the rule for every thing but the original obligation of the marriage ; and that the libel was properly dismissed for want of jurisdiction.

Order affirmed.