COMMONWEALTH *v.* WILLIAM E. BURTON.

[Charged with adultery.]

OPINION of the RECORDER discharging the defendant, was delivered May 3d, 1843, as follows:

In November, 1842, the defendant was arrested on the charge of adultery. After much delay, the case was heard finally on the 27th of April last. *B. & J. M. Rush, esqrs.*, for commonwealth; and *C. Guillou, esq.*, for defendant.

The facts on which the commonwealth asks a binding over, are these: On the 10th day of April, 1823, William E. Burton was married to E. Loft, by banns

in the parish church of St. Martin in the Fields, in the county of Middlesex (England), by D. Morgan, curate. The certified copy of the church record was produced in evidence. How long the parties lived together is not proven. On the 18th day of July, 1842, it appears by the certified record offered in evidence, that William E. Burton, *bachelor*, was married to Caroline Sophia Glessing, spinster, by banns at the parish church of St. Paul, Covent Garden (London), by F. W. J. Vickery, curate. With this (alleged) second wife, Mr. Burton came to Philadelphia, and has resided with her at Philadelphia, at his domicil, ever since. In November last, the first wife causes this complaint to be made, she residing in London.

It farther appears from the evidence of several witnesses, and the correspondence between the wife residing in London, and defendant, that she was importuning him for maintenance for herself and her son, and that the defendant made remittances for that purpose on certain conditions. From the testimony of another witness, it appears that defendant stated to him, that he never was divorced from his first wife, but that his marriage to E. Loft being contrary to the statute law of England, it was void, and that therefore, he had married again in 1834. The facts in evidence on the part of the commonwealth, are fully established, so far as they are the necessary ingredients of the charge.

For the defence, it is alleged that the charge of adultery cannot be made out against the defendant, because he was under age at the time of his first marriage; that this union was illegal and void, and consequently, being an unmarried man at the time of his nuptials with Miss

Glessing, the latter union is not unlawful or criminal. The register of his birth is offered in evidence—by which it is established that William E. Burton, son of William George and Mary Burton, Fetter Lane, London, was born September 24, 1802. The decision of this case rests entirely on the ecclesiastical law of England, and resolves itself into a question of law purely; —to decide which, we must inquire not whether adultery has been committed, but whether the defendant has committed adultery—as defined and known under our laws;—the first can be easily ascertained from the facts in this case; but to determine the latter, involves principles of law.

As stated on a former hearing, I shall regard this case only in its legal aspect; as there is no doubt of the necessity, from the facts, of sending the defendant to a jury for trial, if the charge laid against him can be legally substantiated. To establish the legal charge of adultery against Burton under our statute, for a violation of which he is arrested, he must be "a married man" holding "criminal conversation" with a married or unmarried person. An unmarried defendant cannot be convicted of adultery, although the other party should be married; 2 Dallas 124; 1 Yeates 6. This being settled by the supreme court as the law in our state, it remains only to be ascertained whether Burton be married or unmarried; and if he be married, whether he has held criminal conversation with either a married or unmarried person. As before stated, this involves the principles of the ecclesiastical law of England. Both marriages of Burton were solemnized under that law, in London.

8

If the marriage of Burton to E. Loft be valid and binding, then the marriage to Glessing is void—and under the English law Burton would be guilty of bigamy—there, and there only, for our courts would have no jurisdiction. Within their jurisdiction, he would be guilty of adultery, as charged, in holding criminal conversation with the said Glessing. We must then examine the English law, to decide by its provisions the validity of the first marriage to E. Loft. This is the turning point in the case. If that marriage be valid, Burton has committed adultery, as defined and decided by the supreme court.

By the statute of 26 Geo. 2, chap. 11, it is enacted that "all marriages solemnized, &c., after the year 1754, where either of the parties not being a widow or widower, shall be under the age of twenty-one years," without the consent of the father of such party so under age, or the guardian or guardians legally appointed of such party so under age, and if no such guardian, then the mother of such party (if living or unmarried) and then such marriage shall be "absolutely null and void to all intents and purposes whatsoever." The 15th section of the same act requires, that the marriages as aforesaid shall be registered, and if the parties be under age, the consent of parents or guardians, as the case may be, as aforesaid, shall be also registered.

In Poynter on Marriages 55, it is held that a marriage "originally void, is at all times a nullity, its validity or invalidity not depending like a marriage merely voidable, upon the alternative of the fact whether its nullity had or had not been declared during the lifetime of the parties," &c. "It is to be observed," says the

same author, "with respect to such marriages as the law declares to be ipso facto void, that it is not the acquiescence, or the long cohabitation of the parties, or that there is issue of such cohabitation, or that the parties are desirous of adhering to their contract, which can amend the defect." See also 1 & 2 Haggard Rep.

In sir William Blackstone's Rep. 192, Chinham *v.* Preston, lord Mansfield said, "the marriage is void and null to all intents and purposes, even though the parties should afterwards agree to it, whenever the fact appears directly against the statute."

In 2 Coventry & Hughes' Dig. 939, a marriage is absolutely void by the act of 26 Geo. 2, c. 33, s. 11—if a minor marries without consent. Rex *v.* Inhabitants of Preston, Burr. Sett. cases No. 154; and Burr. Sett. cases No. 162; 1 Hale 692; Trin. 42 Eliz., Babington's case; Coke's Inst., cap. 27; 1 Hawk. P. C. 321; 1 R. Abr. 340, 341. In the case of Dorsey *v.* Dorsey, chief justice Gibson, in giving the opinion of the supreme court, said: "the law of actual domicil at the time and place of the injury, is the rule in cases of divorce, for every thing, but the original obligations of marriage;" 7 Watts 349. The last statute of the parliament of England on this subject is 4 Geo. 4; although it alters some of the provisions of the former act of 26 Geo. 2, yet so far as relates to the points in this case both statutes are similar. See 28 c. Geo. 4.

This then is the English law, and the commentary, and the interpretation, as taken from the statutes, the text-books, and the reports, which govern the institution of marriage, and under which the defendant solemnized this ceremony with E. Loft.

But let us apply another test, derived from our legal construction of marriage. Under our law, where no particular or peculiar form of religion is recognised by the political code, as the spiritual government; marriage is only considered in its civil sense. It is regulated by the rules of civil law or municipal law only. It is a contract, and is so held in contemplation of law. Well then, if marriage is only a contract—to be entered into with no other forms than any other contract, and our courts have given the most liberal translation to the law—it must be subject to all the principles of the law of contracts; and of these none is more firmly fixed, than that the "lex loci," or the laws of the place at which the contract was entered into, shall govern the form and the spirit of the agreement. Apply this principle to the present case.

Burton married E. Loft in London; he was under age. The law which governs such contracts, makes such marriage void to all "intents and purposes whatsoever." This is the declared, written will of those whom the English law-makers represent. It is the highest, the supreme law of the land. Then, if the contract between Burton and Loft was void "ab initio," viewed as either a civil or ecclesiastical ceremony of contract, could Burton be guilty of bigamy by his marriage to C. Glessing? If Burton be guilty of bigamy in England, under the facts of this case, then he is guilty under the same facts of adultery here. There is a distinction between a void and a voidable marriage; under the last statute, a marriage performed contrary to the 14th section of 4 Geo. 4, c. 73, and the 5th section of the same statute, is void

in my opinion. There is, however, another view of the subject which strengthens this opinion, and to which some weight is due.

From the certified record of the marriage between Burton and Glessing, in the year 1834, William Burton is declared to be a "bachelor." Now from the great strictness which prevails under the compulsory force of the statutes, in regard as well to oath before license granted, as to the three weeks' notice before publication of the banns, and the proclaiming the same for three successive Sundays in open church—together with the fact that both marriages were performed, within a short distance of each other, in geographical relation, although in different (yet neighbouring) parishes, the legal inference is, that the publication of the banns of the last marriage, was notice to any parties in interest, to come forward and forbid the same,—this not being done, is it not reasonable to conclude, that the marriage, or more properly connexion with E. Loft, was regarded as void, by all who knew of its celebration—and who must have known of the publication of the banns previous to Miss Glessing's marriage? The marriage to E. Loft was in April, 1823, that to C. S. Glessing, in July, 1834. Eleven years elapsed between these marriages. And again, if the marriage to E. Loft had not been considered void, by all parties, why was not a prosecution instituted against Burton for bigamy, in England?

It is in evidence from the testimony of one of the witnesses for the commonwealth, that long previous to the institution of this prosecution, he had a conversation with Burton in regard to certain articles in a New York paper, referring to his second marriage, and Burton said

that the first marriage was void by the laws of England. This was the belief of one of the parties to the first marriage, and expressed too in friendly converse, without the fear of any peril from violated law. It is no part of my duty to express an opinion as to the conduct of the defendant, as militating against those high moral obligations due to society; he is not liable for a violation of the laws of ethics; but simply for an alleged infraction of the provisions of the code of civil government.

These plain and pertinent suggestions come with great force to support the conclusion I have formed, that the first marriage of Burton to E. Loft, was void. This, it appears to me is the law of the case. I can regard it in no other light than as a void marriage. The prerequisites, made indispensable by law, to the vitality of the connexion, have not been observed, or do not exist.

There is, however, another consideration connected with this case, which has a direct bearing on it, independent of the question of non-age of the parties. By the statute of 4 Geo. 4, there are certain prerequisites necessary to the granting of a marriage license, and the register to be kept, must set out these, as well as other conditions relating thereto. If any of these forms are wanting, it is no marriage. The 14th section of this act, for example, requires "an oath to be taken before the surrogate as to certain particulars before license granted." Without this oath, no license can issue. Should one issue, it is contrary to law. All these prerequisites are required to be registered, and from this register, which is required to be kept for the purpose of affording legal evidence of marriages, no record is made of any one of these antecedent provisions. It will not

do to presume or imply these acts have been done. The certified copy from the register, is incomplete; and as one is attainable, it is the best evidence, the highest order of evidence the case is susceptible of, and therefore, no other kind of testimony can be admitted.

The record here offered is incomplete by the requirements of the statute of 4 Geo. 4, and no secondary evidence is admissible to correct such defect. The omission is prima facie evidence against the record: for if the deficiency exist, it is irregular. No offer has been made to cure this defect by collateral testimony, nor can it be done under the rules of evidence. This record cannot be perfected, by the admissions or other testimony derived from either party. It does not prove a valid marriage; for if the marriage be void, or if it cannot be proven valid, from the authorities already cited, no admissions or consent of either party thereto will make it so. If the record is offered, it must be taken as a whole; it has been here relied on to make out the case of the commonwealth; it has failed. The first marriage, therefore, is not proven according to law. It may be asked if the certified record of the marriage to Glessing sets out all these necessary facts? Should it not, it is unimportant, as affecting this case. Mr. Burton has observed all the forms required by our law constituting marriage, and has lived with Mrs. Burton, while here, with due regard to propriety. Their residence here has made them man and wife, so far as our law requires. This applies to both marriages, but it is now considered in connexion with the marriage to E. Loft.

To indicate the force of this position, let us suppose

a case.   Our law provides that no warrant shall issue unless founded on an oath or affirmation.   This is the antecedent condition to issuing such process.   Suppose then a warrant issued without stating that it was founded on an oath or affirmation—is such warrant void or void-able?—unquestionably void.   So with the license as provided by the statute of 4 Geo. 4; it requires an oath in certain cases before it can be granted, and if, when that is obtained, it does not subvert the prerequisite for its issuing, it is void—else why enact by statute that such is the law, if it be not observed, and if not observed, such difficulties arise.

It is not necessary to collate the facts as given in evidence on the part of the commonwealth.   They certainly go very far to show probable cause of the guilt of Burton, indeed they go much farther, if we admit that his first connexion was legal, or that his second was illicit.   But I stated, after hearing the argument of the counsel for the commonwealth, that this case rested on a question of law, simply, and I should so regard it.

From a careful review of the law, giving to it my best judgment, I am of the opinion, that the alleged marriage of defendant to E. Loft is void, that as that marriage is void, the second marriage to Glessing would not subject this defendant to the penalties for bigamy under the English law, and that this cohabitation does not, therefore, render him amenable to the laws of Pennsylvania for the crime with which he stands charged.

In the course of the argument in this case, the counsel for the commonwealth, with that courtesy and respect which always mark their professional comportment in

a legal tribunal, contended, that as this hearing is but a primary one, and before one of a class of the judiciary, inferior in jurisdiction and prerogative, a binding over was *a matter of course*, if the facts made out "probable cause." This is the substance of the argument, stripped of all propriety of language, in which it was clothed. It was intended, no doubt, as an answer to the suggestion thrown out during the progress of the investigation, that I should regard the law of the case, arising from, and applicable to the facts, as the only important feature presented for examination and decision.

The doctrine thus contended for, has of late become the generally received opinion of many, regulating the character and duties of the magistracy.

Such doctrine is contrary to the very letter and spirit of our constitution, and is a theory of judicial organization, so calculated to depress, deteriorate, and destroy the character, usefulness, and respect due to that component part of the judicial power, to which I belong, that I have felt it a duty to counteract it, as far as my single negation will avail.

To say that magistrates, (or as constitutionally styled "justices of the peace,") shall merely have cognizance of the facts, on which a citizen is charged with having committed a violation of the laws, and deny them the power to inquire or decide, if the facts proven, make out the legal offence charged, is an inconsistency which can only call absurdity its fellow. To give to the justices the right to exercise a power over the liberty and character and happiness of the citizen, and at the same time deny him jurisdiction over the laws, which secure each and all of these privileges to every member of society,

is to take from them the very prerogatives in which their usefulness consists, to destroy the object of their creation, to blot them out of the list of ministers of the law, and at the same time to take from every citizen, the right he has, of being exempt from the hardships and contumely of arraignment before the criminal courts, unless the facts and the law, conjointly, establish the crime with which he is charged.

The commonwealth, through this portion of her officers, would become the oppressor, rather than protector of her citizens; and while the facts on which an offender was arrested would be subject to an investigation before a justice and a grand jury, the law of the case could not be adverted to, until the accused should be arraigned before a jury for trial. Polity like this, is illegitimate to that theory of social organization, which marks out and confines each department of authority to its proper sphere—and regards consolidation or usurpation of powers by a co-ordinate, as opposed to the general good.

The magistrate or justice, I believe, has the same jurisdiction over the law, as the facts, in all cases brought before him, especially all criminal charges. His first duty is to see that the offence charged, is an offence, contrary to the statute or common law, and secondly, that the facts present "a case made out by proof furnishing good reason to believe that the crime alleged has been committed by the party charged."

The power to decide on probable cause implies directly the power to judge of the law, for the "proof" must be subject to those legal principles of evidence, over which the magistrate must exercise a control. Within his jurisdiction the justice is supreme; he is a judge of the

law and the fact; should he give such interpretation to the law as would discharge the accused, he has a right to do so. He is independent of, and irresponsible to, any other judicial tribunal, as such. Impeachment is the only remedy applicable to wilful errors, when they arise.

While I perform those duties which belong as I believe to the office I now hold, never can such a doctrine as that contended for, be regarded but as injuriously affecting the character and independence of the magistracy.

Entertaining conscientiously these sentiments, I have, as far as competent so to do, examined the law involved in the case under consideration. The judgment will be upon the conclusions derived from this examination.

If these opinions are erroneous, contrary to the spirit or letter of the constitution; if they are regarded as arrogating or exercising rights or duties not within the original grant of magisterial power, I have offered all an opportunity to know what are my opinions, and on which I shall continue to act.

A mode is pointed out to correct or prevent a continuance in this course of official conduct, and I will cheerfully surrender the commission under which I act, when that power which confirmed my right to do so, shall have decided the course here contended for to be illegal. *And now, March 3d, William E. Burton is discharged.*