# BENJAMIN H. CHEEVER

*vs.*

# JESSE B. WILSON Et Al.*

1. Up to the year 1860 no law existed in the District of Columbia authorizing a divorce from the bond of marriage for any cause whatever, although in a proper case the Court had power to decree a separation and alimony.
2. A person's domicile is that place in which he has taken up his permanent residence, and to which, when he is absent from it, he has the intention of returning.
3. A domicile once acquired is never lost until a new one is gained.
4. During coverture the wife has no power to change her domicile, except where she has been abandoned by her husband, and he has taken up a new domicile for himself in another jurisdiction; in such case she may choose the old or follow him into his new domicile for the purpose of instituting a divorce suit.
5. But beyond such choice she may not go. She will not be permitted to select that particular jurisdiction whose laws and whose administration of them, she may find best suited to her purpose and make that her domicile, into which she may compel her husband to come to answer her complaint.
6. In a question of divorce there is no difference whether the decree has been pronounced by a judicial tribunal in a foreign country or by a court in one of the States of the Union; in either case the decree is valid if the Court had jurisdiction, and void if it had not.
7. A divorce rendered in Indiana divorcing parties whose legal domicile is in this District is void for want of jurisdiction, although the defendant appeared and submitted to the jurisdiction of the Court.
8. Such a divorce cannot be recognized in any proceeding in this Court which may be based upon it, even though all parties agree to recognize it as valid.

In Equity No. 1398. Rules 5. Decided March 24, 1866.

BILL to enforce the provisions of a foreign decree of divorce.

THE FACTS are stated in the opinion.

MR. THOMAS WILSON, for complainant.

*Res judicata.* A judgment or decree of a court of competent jurisdiction is conclusive, wherever the same matter is

---

* Reversed by the Supreme Court of the United States, see Cheever *vs.* Wilson, 9 Wall., 108.

brought in controversy between the same parties or privies. Miles *vs.* Caldwell, 2 Wall., 35; Hopkins *vs.* Lee, 6 Wheat., 109; Parish *vs.* Fenis, 2 Black, 606; Walden *vs.* Bodley, 14 Pet., 156; Thomas *vs.* Lawson, 21 How., 332; Ableman *vs.* Booth, 21 How., 506; Thompson *vs.* Roberts, 24 How., 233; Aspden *vs.* Nixon, 4 How., 467; Steam Packet Co. *vs.* Sickles, 24 How., 333; Warburton *vs.* Aken, 1 McLean, 460; Bissell *vs.* Briggs, 9 Mass., 462.

"If the judgment is conclusive in the State where it was pronounced, it is equally conclusive everywhere" in the Courts of the United States. Christmas *vs.* Russell, 5 Wall., 302; Story, Const., sec. 313, 3d ed.

The Courts of every country are the exclusive judges of there own jurisdiction, so far as it depends on their municipal law. Rose *vs.* Hinely, 4 Cranch, 241; Grignon *vs.* Astor, 2 How., 339.

In Indiana the decree is conclusive.

Whenever the wife is plaintiff in a divorce suit, it is the burden of the allegation that she is entitled, through the misconduct of her husband, to a separate domicile. If she fails to prove this, she fails in her cause; if she does prove it, she establishes her cause. 2 Bish. Mar. & Div., 126, sec. 125.

A wife may establish separate domicile from her husband. Ditson *vs.* Ditson, 4 R. I., 87; Hanberry *vs.* Hanberry, 29 Ala., 719.

A wife may have separate domicile from her husband for purpose of divorce. Story Confl. L., 285, n.; Jenness *vs.* Jenness, 24 Ind., 355.

Judge Story says: "The doctrine, now firmly established in America, is: "That the law of the place of the actual *bona fide* domicile of the parties gives jurisdiction to decree a divorce. Story Confl. L., 287, sec., 230; see also Bish. Mar., n. to sec., 142; Harding *vs.* Allen, 9 Me., 140.

The protection of innocent parties and the purity of pub-

lic morals require that divorces lawfully pronounced in one jurisdiction * * * should be recognised as operative and binding everywhere." Harrison *vs.* Harrison, 19 Ala., 499; Tolen *vs.* Token 2 Blackf., 407; Maguire *vs.* Maguire, 7 Dana, 181; Wall *vs.* Williamson, 8 Ala., 48; Wall *vs.* Williams, 11 Ala., 826; Fellows *vs.* Fellows, 8 N. H., 160; Pawling *vs.* Bird, 13 Johns., 192; Mansfield *vs.* McIntire, 10 Ohio, 27; Cooper *vs.* Cooper, 7 Ohio, 2d Vt., 238; Gleason *vs.* Gleason, 4 Wis., 64; Hubbell *vs.* Hubbell, 3 Wis., 662; Ditson *vs.* Ditson, 4 R. I., 87.

Apart from the question of divorce, it is submitted that the money part of the decree in the Indiana court is conclusive in this case.

Mr. WALTER S. COX, for defendants.

1. The decree of divorce was void for want of jurisdiction.

The courts of Indiana had no jurisdiction to decree the divorce of any but *bona fide* domiciled citizens of that State. Bishop on Marriage and Divorce, sec. 721 and seq.; Story's Conflict of Laws, sec. 228–230; Chase *vs.* Chase, 6 Gray, 157, Jackson *vs.* Jackson, 1 Johns. Rep. 424; Dorsey *vs.* Dorsey, 7 Watts; Bradshaw *vs.* Heath, 13 Wend., 407–422; Hinds *vs.* Hinds, 1 Iowa R., 36.

The question of *bona fide* domicile is one of fact. It is clear, from the proof, that Mrs. Cheever went to Indiana for the sole purpose of procuring this divorce, with no intention to reside there longer than was necessary for that object. She went in February, the decree was obtained in August, and she returned in September as soon as she had recovered from a sickness. She was never there, as far as appears, before or after that period. See her deposition in supplemental record. The *animus manendi*, which is essential to make a *bona fide* domicile, was wanting.

Besides, during her covertures, she could not have acquired a domicile in Indiana. The former domicile of both

parties was Washington. It is so shown in their marriage settlement.

It is a general rule, that the husband's domicile is that of the wife, and she cannot acquire a different one during coverture. See cases above and Pennsylvania *vs.* Ravenel, 21 How., S. C., 110.

It would be found that the only exceptions are, that if the husband abandons her and acquires a different domicile, she may retain the domicile where she was abandoned and seek her remedies there, or she may go back to her friends in her original domicile and have redress there. See cases cited in Bishop on Marriage and Divorce, sec. 730. She cannot select a domicile anywhere, with reference to the laxity of its laws on this subject.

2. If there was jurisdiction of the person, there was none to affect the wife's property, even through the persons, under the laws of Indiana, which provide that where a divorce is decreed for the act of the husband, the wife shall be restored to her property as if he had died. (See Rev. Statutes of Indiana, of 18——, art. 48, ch. 4, sec. 18.) In this case, the husband's desertion was the ground of the decree.

3. Even if there was jurisdiction, the decree was unjust, and the courts of this District are not bound to carry it into execution. It does not establish a prior indebtedness or title. It merely undertakes, in the exercise of judicial discretion, to *create* rights of property anew. Our courts are called on in this suit to enforce that decree. They are not bound to do so. 3 Daniel's Ch. Practice, 1869.

And if not bound, they ought not to do so. The decree is without a parallel. It divorces on the ground of the husband's desertion, and yet gives him a third of the wife's property, to support the children whom he was bound, at common law, to support himself. It, in effect, awards him alimony for his own offense of desertion. By his own testimony, it appears that he has been supporting the three

children with him, and, therefore, has been able to do it, at great expense. Besides, if the arrearages of rents are allowed him, as claimed, it takes away the wife's whole income for years to come, leaving her nothing for the support of herself and youngest child. The decree undertakes to give away the wife's property to the children when they become of age, which two of them have become since the decree, and further undertakes to dispose of the fee-simple after her death.

MR. JUSTICE WYLIE delivered the opinion of the Court:

This suit was instituted on the 28th day of June, 1858, for the purpose of enforcing a decree of the Circuit Court of Madison County, Indiana, granting a divorce, a *vinculo matrimonii*, between Annie J. Cheever and Benjamin H. Cheever, and disposing of the children and certain property of the parties as is therein set forth.

Annie J. Cheever, shortly after obtaining the Indiana divorce, married one Louis Worcester, who has since died, which explains her appearance in this suit by that name.

The property in question is situate in this city, and was her sole and separate estate for life, with remainder in fee to her children by Cheever under the will of her father, followed by a marriage settlement to which Cheever was a party; and, at the institution of this suit, was and still continues to be in the tenancy of the defendant Wilson, under a lease from Mrs. Cheever and her trustee and mother, Mrs. Hughes.

The marriage settlement is dated the 6th of September, and the marriage between the parties was solemnized on the 8th of the same month, 1842.

The parties resided in this city and lived in harmony till the month of December, 1854, and four children were born to them, namely: John T. H., Caroline P., Benjamin H. Jr., and Victoria I. The first named has reached his majority, and the second very nearly her majority, since the

20

present suit was brought. The other two are now respectively, about the ages of fifteen and twelve.

In the month of December, 1854, "a disagreement" arose between Cheever and his wife, which resulted in his leaving her. He still continued to maintain his domicile, however, in this District, but the children, or at least some of them remained with their mother.

The property in question being vested in Mrs. Sarah T. Hughes, the mother of Mrs. Cheever, for the sole and separate use of the latter, Mrs. Cheever continued to collect its rents and profits.

At that time, and until the year 1860, no law existed in the District of Columbia to authorize any court to grant divorce from the bond of marriage for any cause whatever; although, in a proper case, the Court had power to decree a separation and alimony.

It is manifest, from the evidence in this cause, that Mrs. Cheever was not content to accept the remedy so provided for her case by the laws of this District.

She, therefore, in February, 1857, proceeded to the State of Indiana, accompanied by one of the children, and took up her "residence," as she calls it, in the City of Indianapolis.

The only evidence we have in this record as to the declared purpose of her departure is that given by Wilson, her friend and tenant, and now co-defendant in this cause, who says, "I understood that she went there to get a separation from her husband, but I didn't know, when she first went, what she had gone for."

As both the parties to that proceeding have seemed unwilling to allow the validity of the Indiana decree to be called into question, the interrogatory which brought out this answer from Wilson, doubtless escaped from counsel inadvertently, for the subject was immediately dropped when it was seen to what results a further inquiry might lead.

In May, Mrs. Cheever returned to Washington, remained several weeks transacting business in relation to her property, and in June again proceeded to Indianapolis.

On the 16th of June her petition was filed in the District Court of Marion County, praying a divorce from the bond of the marriage with her husband, Benjamin H. Cheever.

At the same time (as the record certifies) "said attorneys" also filed the affidavit of "a competent person" that defendant was not a resident of the State of Indiana, and thereupon notice by publication was ordered to be given to defendant of the pendency of the suit.

The affidavit is not in the record, and we do not know who the "competent person" was by whom it was made, but there can be no doubt of the truth of the statement. Subsequently Mrs. Cheever filed her own affidavit that she was, at the time of bringing the suit and still was, a *bona fide* resident of Marion County, Indiana.

In what sense she interpreted the terms "*bona fide* resident" we have no means of ascertaining with certainty. The language itself is equivocal, at least to persons who are unacquainted with its interpretation by the Courts, and I doubt whether, even there, its meaning has been perfectly settled. Unless, however, we are to impute to the Legislature of Indiana a purpose to violate its obligations of comity to its sister States, and to claim for its judicial tribunals jurisdiction in cases over which such jurisdiction cannot be conceded, these terms must be understood as synonymous with domicile. And domicile has been correctly described as "the place in which a person has taken up his permanent residence, and to which, when he is absent from it, he has the intention of returning"—Burrill.

Domicile, once acquired, is never lost until a new one takes its place.

In the great case of Somerville *vs.* Lord Somerville, 5 Vesey, Jr. 787, the Master of the Rolls says: "The third

rule I shall extract is, that the original domicile of origin is to prevail until the party has not only acquired another, but has manifested and carried into execution an intention of abandoning his former domicile, and taking another as his sole domicile. I speak of the domicile of origin, rather than that of birth, for the mere accident of birth at any particular place cannot in any degree affect the domicile."

Few cases have been more ably and exhaustively discussed by counsel than this one, and the opinion of the Master of the Rolls has, ever since it was made, been looked to, both in England and in this country as settling the law on the subject of domicile, in almost every aspect in which it can be presented. See also a very interesting case in which this subject was discussed (De Bonneval *vs.* De Bonneval) in 6 Eng. Eccl. Rep., 502. In making her affidavit that she was a *bona fide* resident of Indiana, Mrs. Cheever evidently supposed that a temporary sojourn in the State was sufficient—that if she were there personally her residence was *bona fide*, so long as it lasted. She was strongly bent upon one object, and not to be baffled by ordinary obstacles. We all know, too, with how much astuteness of distinction the human mind will reason, to answer the objections of conscience, when the whole heart and soul and passions are enlisted in eager pursuit of a darling purpose.

It is certain that Cheever's domicile was not in Indiana, and there is no evidence that at the date of these proceedings in Indiana, or even to this day, it has ever been removed from this District.

And as to Mrs. Cheever, we have before us the evidence of her lease to Wilson, dated the 16th of July, 1857, precisely one month after she had commenced her suit for divorce in which she describes herself as "of the city of Washington."

After the divorce decree was obtained she returned to this city, but how long she remained does not appear. We have proof that in June, 1858, she had already been mar-

ried to Worcester, and that her domicile was then claimed by her to be in Kentucky.

But we hold the law to be perfectly settled both on principal and authority that, during coverture, the wife has no power to change her domicile. (See Jackson *vs.* Jackson, 1 Johns. Rep., 424; Dorsey *vs.* Dorsey, 7 Watts; Pennsylvania *vs.* Ravenel, 21 How. Rep., 110.)

This rule may be subject, however, to one qualification, if it indeed be a qualification, in the case where the wife has been abandoned by the husband, who has taken up a new domicile for himself in another jurisdiction.

In that case he shall not be permitted to take advantage of his own wrong in abandoning his wife; and for the purpose of her suit against him for divorce, she can have her choice either to follow him into his new domicile or sue him in the old.

But beyond this she may not choose. She will not be permitted to select from all the thirty-six States of the Union, to say nothing of foreign states, that particular jurisdiction whose laws and whose administration of them, she may find best suited to her purpose, and make that her domicile, into which she may compel her husband to come to answer her complaint by publication of notice in a newspaper.

I do not know that even in Indiana incompatibility of dispositions has yet been made a good ground for divorce *a vinculo matrimonii;* but it is said that such is the law in Prussia, and, if this Indiana decree can be sustained we shall be bound to recognize as valid whenever the case shall be presented, the decree of some Prussian court divorcing a husband and wife whose lawful domicile was here, and procured by the wife, perhaps, during a summer excursion, on which she has availed herself of the opportunity to obtain as valid and *bona fide* residence in Prussia, as Mrs. Cheever obtained for herself in Indiana in the spring of 1857.

For in questions of divorce there is no differance whether the decree have been pronounced by a judicial tribunal in a foreign country or by a court in one of the States of the Union.

In either case the decree is valid if the Court has jurisdiction, and void in neither without it.

In Jackson vs. Jackson (1 Johns. Rep., 424), the facts were almost identical with those in the case before us. The parties had been married in and resided in the State of New York. The wife, deeming herself ill used by her husband, and not being entitled to a divorce a vinculo for such cause in that State, proceeded to the State of Vermont, and there filed her bill in the Supreme Court for divorce, alleging the ill usage and bad temper of her husband towards her as the cause. The defendant appeared to the suit and made defense. The Court "upon hearing the allegations in the said petition contained, and the evidence adduced in support thereof, and the arguments of counsel," granted the divorce with $1,500 alimony to the wife.

Subsequently she brought her action in the State of New York against the husband to recover the alimony given her by the Vermont decree.

The husband made defense that the Court in Vermont had not jurisdiction of the cause, notwithstanding he had appeared and submitted to the suit.

The Supreme Court of New York held the defense good, and that the Vermont decree was null and void, because at the time it was made the domicile of the parties was was in New York, and that during coverture the husband's domicile was his wife's, and that she could not change it.

Chief Justice Savage, in referring to this decision, says, " In Jackson vs. Jackson both parties appeared, and, therefore, the Court had jurisdiction of the parties, but the divorce was held void, because there was no jurisdiction

over the subject-matter." 16 Wen. Rep., 407–422, Bradshaw vs. Heath.

In Dorsey vs. Dorsey (7 Watts, 349), a case now familiar to the profession from the remarkably able opinion of Chief Justice Gibson, the same doctrine is maintained in regard to the inability of the wife to obtain a domicile different from her husband's during the coverture.

The same principle is also asserted by the Supreme Court of the United States in a recent case. Pennsylvania vs. Racvenel, 21 How. Rep., 110.

In Barber vs. Root (10 Mass. Rep., 265), Sewell, J., in delivering the opinion of the Court, expresses himself on this subject with natural indignation, and declares, "I must be permitted to say the operation of this assumed and extraordinary jurisdiction is an annoyance to the neighboring States, injurious to the morals and habits of their people, and their exercise of it is, for these reasons, to be reprobated in the strongest terms."

The doctrine that domicile, actual and *bona fide*, can alone confer jurisdiction is said by Mr. Justice Story to be now the firmly established law in America. Wheaton, in his work on international law, asserts the same doctrine, and says, "this, of course, excludes such divorces as are obtained in fraudulent evasion of the laws of the State by parties removing into another for the sole purpose of obtaining a divorce." Bishop declares the same doctrine, and adds, "nor is this proposition at all modified by the fact that one or both of the parties may be temporarily residing within reach of the process of the Court, or that the defendant appears and submits to the suit. This is the firmly established doctrine in England and America. Bish. Marr. and Div., ch. 34, s. 721.

In England, until the passage of a recent act of Parliament, (20 and 21 Vict., ch. 85,) there was no power in the Courts to decree for any cause whatever, and the Courts would not recognize the validity of the decree of any foreign tribunal

professing to divorce a marriage which had been solemnized in that country.

In Lolly's Case, decided in the year 1812, by the twelve judges (1 Russ. and Ry. Ca., 236), this doctrine was maintained in all its breadth, in a case which appealed most powerfully for its relaxation. Lolly had married in England and afterwards removed to Scotland with his family, and there obtained a new and *bona fide* domicile. For a cause occurring in Scotland after his removal, one of the Courts there decreed a divorce from the bond of matrimony. He then returned to England and married the second time, for which he was indicted, tried and convicted of bigamy and sentenced to seven years transportation. The question of the validity of this sentence was in due form brought for decision before the twelve judges and they held the conviction right.

This doctrine, however, was resisted in the Scotch Courts with great firmness and ability, and was at length assailed in a powerful argument by Lord Brougham in the case of Warrender *vs.* Warrender (9 Bligh., 89), and will not probably survive much longer, if it have not already been overthrown, as an authority in the English Courts.

The Scotch judiciary have always held that they had jurisdiction in cases of divorce, even between strangers who were commorant in Scotland, provided the alleged cause of divorce had occurred in Scotland. They treat the cause for divorce as an offense against their laws, which they will punish by granting a divorce to the injured party. But they require, in such case, the guilty party to be amenable to their process, and the offensive cause to have been committed within their jurisdiction.

So long as the marriage contract is executory, it is on the same footing with other personal contracts, and for its violation the injured party may sue the other wherever the latter may be found; or, the contract may be cancelled by mutual agreement. Nor is the law at all solicitous about

the forms or ceremonies with which the marriage may be solemnized. Ability to contract and consent of the parties are all that is required.

But after the marriage has been solemnized the contract is thenceforth *functus officio.* The parties have then become subjects of the marriage state, an institution whose obligations and duties are independent of contract and of the will of the parties, and imposed by the law for the welfare of society; an institution established in the beginning by the Almighty Lawgiver, and recognized in every age as the foundation of civilization, prosperity, and virtue without which the human race itself must perish from its own vices; the refiner of manners, the parent of knowledge, thriftiness, and industry; the promoter of decorum, order, and decency in private life; the strength and bulwark of the state; the secure basis of society, and the ornament of all its institutions; "*principum urbis, et quasi semiranium reipublicae.*"

An institution so established in the laws and bound up with the structure of society, the State cannot allow to be made the subject of traffic like a chattel. So long, therefore, as the parties retain their domicile under its jurisdiction, the State will not permit its policy to be thwarted and its laws invaded by the interference of any foreign tribunal. As well might any legislature assume to dissolve the marriage bonds between the citizens of a different State by an immediate act, as to attempt to accomplish the same purpose by means of authority conferred upon its courts.

These doctrines. if correct, are fatal to the proceedings in the present case; but it still remains for us to examine more particularly the character of the proceedings in the Indiana courts.

As already stated they were commenced by Mrs. Cheever on the 16th day of June, 1857, by a petition to the Circuit Court of Marion County, not signed by herself, nor its allegations supported by an affidavit. And, indeed, none of the allegations made in this case on either side were made

*21*

under oath or even the signature of the parties, but have their only support for truth in the signatures of the respective counsel in the pleadings, except only the two affidavits as to residence.

The petition charges cruel and severe treatment towards her on the part of her husband, and that he had abandoned her in the month of December, 1854; it states the names and ages of the four children respectively, describes the real property, and states correctly the manner in which it was settled to her own sole and exclusive use, and its situation in this city. It also sets out that she held certain stocks in her own name which were worthless, and a small amount of personal property. It prays for a divorce, a *vinculo matrimonii,* and that she may be appointed guardian of the children, two of whom were then in her custody and two with the defendant, and for general relief.

On affidavit that defendant was a non-resident an order of publication of notice was made the same day.

On the 17th of August, 1857, an order for change of venue was made to transfer the cause to Madison County for further proceedings, but for what cause does not appear.

On the 20th of August defendant appeared, and by his attorneys, filed a general answer denying each and all of the allegations in the petition, also a cross-petition, admitting that he had abandoned his wife in 1854 because of a "disagreement" between them, which was wholly irreconcilable, and that it was impossible for him to live with her, and that he was compelled to abandon her. He also prayed a divorce, a *vinculo;* for the custody of all the children, and for an assignment of the stocks, and of the rents, issues, and profits of the property in this city to him as the natural guardian of the children for their support, education, and maintenance, and for general relief.

On the same day petitioner, by her counsel, filed her answer to the cross-petition denying all its allegations so far as they were inconsistent with her petition.

It appears that some depositions had been taken on both sides, but on the 24th of August, just two days before the cause was submitted for the decision of the Court, an order was made that both parties might withdraw their depositions, and no depositions are now to be found in the record.

On the 26th the case was submitted on the petition, cross-petition, and the general answers of the parties, of the character already described. Beyond these there was not a particle of evidence before the Court, and these were the mere allegations of the counsel of the respective parties made in the pleadings. The cause was submitted without argument on either side.

The Court declared that none of the allegations of the petition were found to be true, except the charge of abandonment; and as that had been admitted by the cross petition, the Court appears to have considered it fully proved. On this foundation the divorce was decreed, as prayed for by both parties.

It was, therefore, a divorce of the parties by their own agreement, in which the Court was used as an' instrument merely to put the agreement into form. The remaining portion of the decree professes to have been made by consent of parties, and assumes to dispose of the children and the property.

Two of the children, John T. H., and Caroline P., are given to the father; and Victoria Josephine is, for the present, and till the further order of the Court, given to the mother.

The other child, little Benjamin, seems to have been forgotten, as no provision is made for his case.

Some worthless stocks, which stood in the name of Mrs. Cheever, are given to the husband.

The real estate in Washington, which was held in trust for the sole and separate use of Mrs. Cheever for her life under the will of her father and by the marriage settlement with remainder in fee to the children, is disposed of

as follows: Two-thirds to Mrs. Cheever, the remaining third of the rents and profits to Cheever, for the support, maintenance, and education of such of the children as should be in his custody till they should arrive at the age of twenty-one years, and then to be divided amongst them equally during the mother's life.

At the mother's death the whole of the property to be vested in three of the children, Benjamin being again excluded.

And it was ordered that Mrs. Cheever should execute a power of attorney to authorize Mr. Cheever to receive and collect his third of rents and profits so given to him by the decree, as the same should thereafter become due and payable. In professed obedience to this decree, Mrs. Cheever did execute a power of attorney for that purpose, but stated in the body of the instrument that it was subject to an incumbrance of about five thousand dollars upon the whole rents, which had already been advanced to her by her tenant, Wilson, to be deducted out of future rents.

This power of attorney of assignment, was looked upon by Cheever as an attempted fraud upon his rights under the decree and in this suit he repudiates it altogether, and claims to have the Indiana decree enforced according to its terms, charges fraud and collusion upon Wilson the tenant, with Mrs. Cheever, to deprive him of his rights, &c., &c.

There are many other incidental or subordinate points in the case, which it were too tedious to consider, because their consideration is not necessary. The case has been before the auditor, much evidence has been taken on both sides, and the auditor has furnished us a long and carefully prepared report containing much evidence, long accounts and his own views upon the law and the facts, and calculations in different ways prepared to our hand, to meet our decision as it might turn out to be, according to the one or the other theory considered by him. Able and numerous counsel have been employed on both sides, and both sides

have presented many exceptions to the auditor's report, which have been fully argued before us. All parties, all the counsel and the auditor, have treated the Indiana decree as binding on the parties; and the reason, doubtless, was that it was a decree which both parties desired, and which was obtained, as we have seen, solely upon their concurrent petitions.

It is due to the auditor, however, to say that the order of reference did not specifically require him to report upon this subject.

But in our view, that decree is wholly void, as to each of the subjects of which it claims to dispose—the divorce, the children, and the property, over none of which had that court any right to assume jurisdiction.

It cannot, therefore, be respected as the foundation of a suit in this Court.

After what has been said, it may not be necessary, but for the purpose of making ourselves perfectly understood, I will restate our views of the law, distinctly and briefly.

The Constution of the United States provides that "full faith and credit shall be given in each State to the public acts, records and judicial proceedings of every other State." That is undoubtedly the supreme law in this District as well as in the several States. But in every case, the first inquiry is as to the jurisdiction of the Court in which the proceedings were had. The Constitution does not mean that we shall give full faith and credit to the proceedings of a State Court in adjudicating a case as to which it had no jurisdiction. In such a case as that its decree or judgment is a nullity—not voidable only, but absolutely void; and the officer of the law who attempts to execute process under it may be resisted as a trespasser, and this, too, in the very State where the judgment or decree was made. Elliott vs. Piersol, 1 Peters, 340; D'Arcy vs. Ketchum, 11 How., 165.

It will hardly be pretended that decisions made by

courts not having jurisdiction over the subject and the parties, may be treated as null and void in the States where they are made, and yet be entitled to "full faith and credit" in the other States.

But we may be told that both parties to the decree made in Indiana have given their consent to and are still willing to acknowledge it as binding upon them. But this consideration strengthens our objections to that decree. The record shows it was based upon a solitary fact, which both parties, by their attorneys, came into Court and admitted; that nothing else was proved or admitted in the cause; that both parties also joined in the same prayer for divorce; that they agreed also as to the disposition of the children and division of the property; and the Court merely put their agreement into the shape of a decree. There was manifestly too much agreement between the parties to this proceeding—enough to stamp it with collusion, if it were not void already for want of jurisdiction in the Court.

Consent of parties will not give jurisdiction (see Mills vs. Brown, 16 Peters, 527), nor, in our judgment, will it make valid a void decree rendered in Indiana in fraud of our laws, divorcing parties whose legal domicile was at the time in this District.

No consent of parties or urgency of appeal could induce us to carry into effect a decree of that character; but, on the contrary, we feel bound to stamp it with our strongest reprobation lest we, too, should become party to the fraud, and an evil example be set by a tribunal in whose eyes fraud should be an abomination.

The consequences which may follow from this decision may be inconvenient to the parties, and, if Worcester were still living, might be serious to one of them, but they will probably prove to be less inconvenient than may at first thought be apprehended.

If these parties cannot or will not agree to condone the errors or wrongs committed in the past, and resume their

long interrupted marital relations, there are courts still open, whose jurisdiction is unquestionable, where their complaints may be filed and justice done between them after full hearing and investigation.

In any event, however, it is our duty to declare the law as we believe it to be, and so far as we are permitted to do, by the law and the evidence, to make such decision as shall tend to uphold and protect that sacred institution which was established in the begining by the Creator, and which, if suffered to sink into neglect, or its duties and obligations to be cast aside at pleasure or for trivial causes, virtue and purity and order must cease to exist, and violence, licentiousness, and corruption pervade society.