## HOLLISTER v. HOLLISTER.

| 6 | 449 |
| 23 SC | 267 |
| 6 | 449 |
| 35 SC | 1470 |

Testimony taken under a *commission* cannot be read, if the attorney of one party was present when it was taken, though he took no part in the examination and was not employed to attend.

The removal and domicil of husband and wife in another state is no bar to proceedings for divorce on the part of the wife, for causes occurring in this state prior to the removal, if she has returned and resided in this state one year previous to the filing of the libel.

*Semble*—Subsequent reconciliation is no bar to a divorce *a mensa et thoro* for cruel treatment prior to the reconciliation.

Appeal from the Common Pleas of Venango county.

*Sept.* 28. The appellee filed a libel for divorce *a mensa et thoro*, and for alimony, averring a marriage with appellant in 1835, with whom she lived until 1842, when she left him on account of cruel treatment, and that she " is a resident in this state, and has resided here more than one year prior to the filing of this libel."

The appellant pleaded that the causes of divorce had happened in Ohio.

On the trial it appeared that prior to 1841 the husband (appel-

lant) had been guilty of barbarous treatment of the wife by excessive beating, &c. In that year he removed, with his wife and family, to Ohio; and there was some evidence of a reconciliation before and at the time of his removal. After the removal the ill treatment was continued.

CHURCH, P. J., instructed the jury if the reconciliation was *bonâ fide* and not pretended on the part of the husband, the prior acts of cruelty would not sustain the libel. 2. That actual residence in this state by the wife, for one year prior to filing the libel, authorized the proceeding though the husband was domiciled in Ohio, her citizenship in the act meaning only *bonâ fide* residence.

The respondent had taken testimony on a commission to Ohio, in the return of which it appeared his attorney was present when the testimony was taken. He offered to read it, with proof that the attorney took no part in the examination, but merely attended with the witness, to show him the commissioner's residence, but was not employed to attend, nor had the respondent knowledge of his attendance. The court rejected the evidence; there being no notice to the libellant of the time of taking the testimony, and her attorney not being present.

*Howe* and *Pearson*, for appellant.—The domicil of the husband being that of the wife, the court was without jurisdiction of the persons: Dorsey v. Dorsey, 7 Watts, 350. By the reconciliation and removal, the courts of Ohio became possessed of the jurisdiction.

The practice in chancery, of excluding attorneys when testimony is taken, has never been adopted in this state, nor in some others: 2 Miles, 272; Farrow v. Commonwealth, 18 Pick. 53; Cunningham v. Otis, 1 Gall. 166.

*Riddle*, contrà.—Domicil and residence may differ for certain purposes: School Directors v. James, 2 Watts & Serg. 568; and the act of 1843, p. 340, recognises this, in giving jurisdiction in case of residence within this state for one year, for causes of divorce happening herein, which supposes a change of domicil by the husband.

The attendance of the attorney of one party must necessarily tend to injustice; and this has been so apparent, that by the settled rule in chancery, attorneys and the parties are excluded: Harr. Ch. 310, 327; United States v. Price, 2 Wash. C. C. 356.

*Oct.* 9. COULTER, J., (after stating the case.)—The practice of the Court of Chancery in England is to disallow depositions taken

by a commissioner, when the party procuring it was present with the commissioners at the time of taking it. The party, his solicitor or agent, procures the attendance of the witnesses before the commissioner, but must withdraw while it is being taken. The authority of our courts to obtain evidence of witnesses not within the state, is derived from the 6th section of the 5th art. of the constitution, which provides that for that purpose they shall have the same power as a court of chancery; and in the absence of any prescribed formula by statute, the inference would seem to be reasonable and inevitable, that the power is to be exercised according to the chancery rules. The chancery rule is also commended to our adoption by its wisdom and fairness. When depositions are taken within the state, the time and place is fixed, of which the opposite party has due notice, and has the opportunity of being present if he thinks proper. But in relation to depositions taken on a commission without the state, the time and place is not fixed, and depends upon the option of the party procuring it, who selects his own time. It is therefore unreasonable to allow his presence, or that of his agent, when the opposite party has no notice, and no opportunity of being present by himself or his agent. We think the court were right in rejecting the deposition in all the phases under which it was presented in the three several bills of exceptions. The rule being general, is unaffected by the circumstance of the quiescence or activity of the attorney, or whether or not he was employed in the conduct of the suit. He was the attorney or agent of the party for that occasion.

The next matter presented for consideration is the jurisdiction of the court. If the acts of violence complained of had been committed in the state of Ohio, the Pennsylvania courts would not have had jurisdiction: Dorsey *v.* Dorsey, 7 Watts, 349. But the testimony is clear that the acts of violence alleged in the libel were committed in this state, and in the county of Venango, where the libel was presented. Did then the removal of the traversee to the state of Ohio, and his residence there, since the autumn of 1841, oust the jurisdiction of the Pennsylvania courts? By the common law, the domicil of the wife follows that of the husband. Wherever his home is, there also is hers. In the nuptial contract she virtually says to him, thy country shall be my country, and thy home shall be mine. This point was ruled in Greene *v.* Greene, 11 Pickering, 410. If, therefore, the domicil of Hollister was in the state of Ohio, which was but feebly contested, and seems fully established by the evidence, the libellant was not entitled to a divorce in the

courts of this state, under the provisions of the act of the 13th March, 1815 ; the 11th section of which enacts, that no person shall be entitled to a divorce from the bonds of matrimony who is not a citizen of this state, and who shall not have resided therein one full year before filing his or her petition.   But the act of 18th April, 1843, kindly comes to the aid of the libellant, and provides " that the word *citizen* used in the 11th section of the act of 1815, shall not be construed to apply to any woman who shall have had a *bonâ fide* residence in this state at least one year previous to filing her petition."   The general policy' of this last act is not for me to question.   But whatever its operation may be in the main, its effect in the case before us is not only opportune but beneficent.   The libellant alleges in her petition, that she had an actual *bonâ fide* residence in the state of Pennsylvania one year and more before filing her petition, and the respondent avers she left his bed and board in the state of Ohio, in the fall of the year 1842, without specially traversing the allegation that the libellant resided one year in Pennsylvania before filing her petition.   And the court distinctly instructed the jury that they must be satisfied with the evidence that the libellant did *bonâ fide* reside in Pennsylvania one year before filing her petition, as a necessary preliminary to their returning a verdict in her favour ; and they so found.   The court therefore had jurisdiction of the cause.

The next question raised on the record is one of great moment, and has received the careful attention of the court.   It is, whether a reconciliation, after the abuse and ill-treatment alleged in the libel, and subsequent cohabitation, is a remission of the offence, and a bar to a divorce, without proof of new outrages after the reconciliation.   It has been ruled in Connecticut, and several other states, that cohabitation with the guilty party, after knowledge of the commission of adultery, is a bar to a divorce on that ground and for that offence.   But these decisions probably depend upon statutory enactments in those states.   Without intending to impugn their wisdom or authority, as to identical cases, we do not recognise them as authority applicable in this state to cases of divorce, *a mensa et thoro*, for cruel treatment, or even as persuasive guides from analogy.   Our own statute of the 13th of May, 1815, enacts, that in cases where the libellant has admitted the defendant into conjugal society and embraces, after he or she knew of the criminal act, it shall be a bar to a divorce.   But as there is an entire absence of any such provision in cases of divorce for cruel treatment, I draw from thence an argument, that cohabitation,

after such abuse, is not a bar to divorce for that cause. The distinction between the two cases seems to be founded on a just conception of the conjugal relations. The crime of adultery may, and sometimes doubtless is, committed, especially on the part of the husband, when there are many atoning qualities, such as personal respect and kindness, and even love for the wife, with great attention to her comfort. And the very act of after-cohabitation implies forgiveness. But with regard to personal indignities and barbarous treatment, nothing but the devoted fondness of a female submission in distress, could induce her to remain after the infliction of personal indignities, with the hope of softening her husband's heart. It is the duty of a wife to forbear long, and to endeavour earnestly to reclaim her husband. If she fail—if her kindness, her tears, and her sorrows are of no effect—shall the very virtue of her patience and fidelity deprive her of the only remedy which the law holds out to broken peace and ruined hope? In the case before us, we may fairly presume that the libellant went with her husband and her children to the state of Ohio, in the strong hope that he would no longer abuse and ill-treat her, but recognise the duties and obligations of a husband. And why did she return? Why did a woman who had been ignominiously kicked, and often choked till her neck was black; who was seen, after abuse, with blood on her face, and the sufferer of other indignities, follow her husband and children to the state of Ohio? Why did she return lonely and desolate? Because the crushed heart requires relief—some word of kindness—some look of compassion. And if she had received any of these from her husband, we may safely presume that the fidelity which prompted her to go, would have induced her to remain. But although no overt act of violence is in evidence committed in the state of Ohio, yet there is a gleam of light from the testimony of Swartz, which proves that the same temper was in the husband which characterized him in Pennsylvania. He asked the witness how much he would charge for splitting plank to build a *pen* for his wife, where he could lock her up. It is of no consequence that this was not uttered in the presence of his wife; it is only important as showing the state of his feelings towards her, and indicates them plainly enough, and that she had small chance of comfort from his amendment or reform. A man may, in a thousand ways, which cannot meet the eyes of witnesses, wound the bosom of his wife, which he has made desolate by his cruelty, so as to render her life burdensome, and compel her to withdraw

from his house and her children, alone and unprotected—the heaviest affliction which could befall a woman who had endured so much, and had even laboured to conceal the cruelty of her husband, from her attachment and fidelity to him and her children. We are of opinion that the facts connected with the reconciliation after the last acts of violence proved to have been committed in Pennsylvania, and subsequent cohabitation, are not a bar to a divorce for acts of cruelty, violence, and outrage committed before the reconciliation. In Perkins *v.* Perkins, 6 Mass. Rep. 69, it was decided that a divorce, *a mensa et thoro*, would not be refused upon proof that after the personal violence complained of was committed, the parties had lived together. The court below erred, if they erred at all, in leaning too much towards the traverser, when they instructed the jury, "that if the reconciliation alleged was *bona fide* and sincere on the part of the husband, at the time, it would be a bar to a divorce." It is hard to tell whether the mind is sincere at a particular point of time or not: except from previous and after events and circumstances, and they speak against the traverser. Few men are so entirely barbarous as not to have some moments of humanity, some oasis in the desert. The case was submitted to the jury upon that basis, whether the husband was sincere in his promise of better treatment, or only guilefully imposed on the petitioner; and the jury found against him. In our view of the law he has nothing to complain of—there was no error as against him. I believe I have noticed all the errors assigned, none of which, in the judgment of this court, are sustained in law. The proceedings of the court below, including the decree of alimony, are

Affirmed.