## Roth v. Roth.

*Divorce—Cruel and barbarous treatment—Wife living apart from husband—Cause of action.*

The fact that a wife was living apart from her husband at the time of the alleged indignities is not per se and under all circumstances a conclusive bar to a divorce for the cause of cruel and barbarous treatment offering such indignities to the person as to render the condition intolerable and life burdensome, and thereby forcing her to withdraw from his house and family.

*Evidence—Charge of court—Controlling interpretation.*

It is error when the trial judge, having properly admitted evidence of circumstances tending to establish the alleged cause of divorce as part of defendant's course of conduct, goes farther than is warranted in stating in his charge what legal effect the jury ought to give to these circumstances standing alone when they were capable of another construction than that put upon them in the charge.

*Divorce—Cruel and barbarous treatment—Single indignity.*

A single indignity to the person is not sufficient of itself to entitle a libellant to divorce for cruel and barbarous conduct. There must be evidence of such a course of conduct or continued treatment as renders the wife's condition intolerable and life burdensome.

*Refusal to support deserting wife not a cause.*

Where a wife has deserted her husband without justifiable cause his refusal to support her afterwards, she still persisting in her separation from him, is not such indignity to her person as, standing alone, entitled her to a divorce.

Argued May 15, 1900. Appeal, No. 203, April T., 1900, by respondent, in suit of Catherine M. Roth, by her next friend William Frazier against John M. Roth, from judgment of C. P. Butler Co., Sept. T., 1899, No. 49, on verdict for plain-

tiff. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ. Reversed. Opinion by RICE, P. J.

Libel for divorce. Before GREER, P. J.

It appears from the record that on March 11, 1895, libellant applied for an absolute divorce on the ground of cruel and barbarous treatment. Her libel being amended December 11, 1895, the litigation continued until adjudicated by BARKER, P. J., specially presiding, who dismissed the petition on April 9, 1896. No appeal was taken from this adjudication. On July 15, 1899, libellant again presented a petition seeking divorce, alleging cruel and barbarous treatment, etc. There was evidence tending to show that libellant left her husband about February 1, 1895. There was evidence tending to show that subsequent to December 11, 1895, respondent several times visited the house of the father of libellant where she was residing. Libellant submitted testimony tending to show that such visits were objected to by her and caused her annoyance and fear, and that on one occasion he kicked her dress and called her a black bitch. Respondent in his evidence denied the assault and use of opprobrious epithet, and stated that his visits were for the purpose of inducing his wife to return and live with him.

Defendant submitted, inter alia, certain points which, with their answers, are as follows:

[1. That only two contingencies could arise that would entitle a wife to divorce under this statute as set forth in libellant's libel: (a) where any husband shall have by cruel and barbarous treatment endangered his wife's life; (b) where he offered such indignities to her person as rendered her condition intolerable and life burdensome, thereby forcing her to withdraw from his house and family. *Answer:* We affirm this with the qualification that where a man has no house and is not living with his family, that it would be impossible for his wife to leave his house and family, but on that account she would not be barred from her right to a divorce.] [1]

[3. The evidence showing libellant and libelee did not live and cohabit together since the      day of February, 1895, indignities to her person, cruel and barbarous treatment, if any, could not have had the effect of forcing her to withdraw from

his house and family. *Answer :* That we affirm because he had no house and family with which he was living.] [2]

[4. That a wife seeking divorce under the provisions of the second specification must have been an inhabitant of her husband's home or enjoying conjugal embraces and association at the time the conduct complained of occurred, and said conduct forced her to withdraw from his home and family. *Answer :* We will not affirm that in that shape.] [3]

[5. The uncontroverted evidence being that libellant was not a member of libelee's home and family since February , 1895, she could not be forced to withdraw therefrom at a later date. *Answer :* It is true she could not be forced from the home which she did not have.] [4]

[8. No sworn allegation having been made in the libel that complainant's life was endangered, evidence as to such acts is not admissible. *Answer :* We refuse that.] [5]

The court charged the jury in part as follows :

Now, gentlemen, you will consider the evidence. This case was heard once before in this court; there was no demand for a jury trial; the testimony was taken by the court, and this court submitted the case to Judge BARKER, of another county, who was at that time hearing cases here, and he made a decree refusing the divorce on the ground that the facts had not been made out by the weight of the testimony and on some other grounds, and now, gentlemen, that was an adjudication of this case up until that time, the filing of the bill, or rather up until the time the bill was amended. The petition in that case was filed on March 11, 1895, and it remained in that way until December 11, when the plaintiff, by her attorney, came into court and asked the court to allow an amendment, and the court allowed the amendment, and in that they laid other grounds, and to sustain their position they offered proof before the court and that was submitted to Judge BARKER, and on it he determined the case; whether Judge BARKER's decision was right or wrong is not for us to decide, and I am sorry either of the attorneys commented upon it; it was out of place to try Judge BARKER or his decision. Now the plaintiff in this case took no appeal to the higher court from the decree of Judge BARKER, therefore that is settled and fixed firmly, absolutely, and we

could not now turn the facts which he heard over to you as a jury to decide, so we have to throw that clear out of the question. Come down now to what occurred after the date of the amendment of the petition for divorce; all the other testimony and facts are to be entirely thrown out of your minds. [Before the plaintiff can get a verdict here she must convince you that the defendant here has, by cruel and barbarous treatment, endangered his wife's life or has offered such indignities to her person as to render her condition intolerable and her life burdensome and thereby forced her to withdraw. The plaintiff is not bound to prove all these things; you will notice here there are two distinct charges; the first charge is, by cruel and barbarous treatment endangering his wife's life, and second, has he offered such indignities to her person as to render her condition intolerable and life burdensome; either one of these, if proven, would entitle the plaintiff to a divorce; she can prove either, and if you believe she has sustained either, then it would be your duty to find for the plaintiff, but should you come to the conclusion that she has proven neither, then your verdict must be for the defendant; if she has proven and has convinced you and proven both, then you should find for the plaintiff.] [6] You will have to take up what occurred after December 11, 1895; [sometime after that, in the spring of 1896, Mrs. Roth moved on the farm where she had lived;] [7] She was the daughter and only child of David Frazier, who owned two farms; he lived on one himself and put Mr. Roth and his daughter on the other, and there is where she was living when the trouble first began. It seems that sometime in 1896, Mrs. Roth went to the house and was living in it after she had left him before and gone home to her father's; [she charges here that he came to that house when she was there at different times, annoying her, pounded on the windows, rapped at the door, went around the house, came at various times and in that way annoyed and disturbed her. We say to you, if you believe that, that would be an indignity, if kept up for any length of time, and if it was a continued offense, kept up right along when he had an opportunity to do it, that would be treated as an indignity to her person and one which she would have a right to complain of here.] [8] [She alleges at one time he came there when she was cooking supper and came into the house, without any authority

from her, and stepped in and when she was passing him he kicked up her clothes and called her a black bitch; she testifies to this and he denies it, and it is for you to say which of the two is telling the truth; if you believe her statement is right, and believe that after she had gone to her own home he followed her up and came into the house and kicked up her clothes rudely or revengefully or in an angry manner, then he was guilty of assault and battery on her person; it is for you to say whether or not he did so. There is an important point right there; if he did that and did other indignities he would be guilty of assault and battery and was guilty of such violence on her person as to entitle her to a divorce; if you believe that transaction and other indignities connected with it, we say to you it is your duty to return a verdict for the plaintiff. The law requires the plaintiff to make out the case, puts the burden of proof on the plaintiff;] [9] if you believe her statement in preference to his and believe he committed these other indignities, then we say in the outstart you should render a verdict for the plaintiff; if you do not believe that, then comes the question as to the indignities followed up. The court has held that where a husband refuses to provide for his wife and has not provided clothing or provided the wife with food and has not done what a husband ought to do towards keeping the wife, that he is guilty of an indignity. [So far as that question before was concerned in the other case, Judge BARKER heard what was done while John Roth lived on the farm and if he did not pay the rent that is not our business here; but after that time, after the wife went back to the house, is there any proof here that John Roth furnished anything for these children? Is there any proof that he furnished a necktie or pair of shoes? Did he give her anything to eat from the day that the wife went on the farm in 1896 until this application? If he did not and has shown no good reason—of course, if he could show that he was sick or in distress, that would be an excuse or reason—but if he shows no good reason why he did not feed them and clothe them, that is an indignity, so held by the courts, and such indignity that, if persisted in and continued, that the wife would have a right to ask a divorce.] [10] How was his conduct otherwise? Did he come around the house at night? Was he a terror to the wife and children or was he a

man whose visits were welcome by his wife and children? These are matters you take into consideration in determining his be-. havior and his conduct. [Was he that kind and generous and liberal and careful father and husband that he ought to have been? If he was and there was no assault and battery on the wife, then the verdict ought to be for the defendant. We say to you here that he had no business whatever at her house; it is in evidence that he had been in this court before on account of violence and surety of the peace and that he was notified or asked not to go near her house. Now we say to you if in any case of all these he followed her up and taunted her and annoyed her and made her nervous and feel uncomfortable and feel unsafe, that he was guilty of violence towards her. Had she reasonable grounds to apprehend that he would commit violence? If she had, then the verdict must be for the plaintiff. [11] You have the testimony here of his coming there on the day of the picnic; he was not invited to the picnic, but he came down and you heard Mr. Aiken's testimony as to what the children did and where the singing went to and what was done. Was there such behavior on his part as to reasonably give her apprehensions? You heard Mr. Aiken's testimony that she was pale and nervous; was she alarmed at his presence? If she was every time he appears before her without something on his part to show that he was going to be kind, he is guilty of the continuance of such acts as would make her afraid. Another question is raised here, that she was not forced to withdraw from his home. Well, gentlemen, if a man has no house and has no family that he is living with, it is utterly impossible for the wife to withdraw from it; if a man married a wife and took her home to her father's house and never provided a home, but abused her and went there and called her names and kicked up her clothing and called her bad names charged here, annoying her right along, I think there is no court in the world that would say she could not get a divorce because she did not withdraw from his house and family, but the courts have not held down to that ruling in any decisions I find. Has the defendant's conduct been such kind and character that the wife can live and cohabit with him safely? That is, can she be in the house with him without fear or distress, is she safe? Has she reason to apprehend that she is not safe? The home and family would

really mean in law the association with the husband; if she tells him to go away from her and keep away and she insists on his going and has put a man in her house, it looks very much as though she has withdrawn from his association about as far as she can.

[Take this case and if you find that he committed assault and battery upon her at the time she alleges he called her a black bitch, and said what she says he did, and pulled up her clothes or kicked up her clothes, and there were other acts following that would give her the right to reasonably be afraid, we say to you it is your duty to render a verdict for the plaintiff, but should you believe Mr. Roth's statement, that he simply did it accidentally and he says, "You are a black witch, Katie," then of course the assault and battery would not be made out. Just there you have a right to take his own language and in weighing his testimony and hers, see from that whether or not his statement is true. Would he call her a black witch? Was he in that condition to be joking, saying sweet, smart things to his wife?] [12] These are matters you take into consideration in weighing his testimony and hers. Now take the whole case, throwing out, as I told you before, everything that was done before the amendment of the petition on December 11, 1895.

Verdict and judgment for plaintiff. Defendant appealed.

*Errors assigned* were (1–5) answers to certain points of defendant, reciting points and answers. (6–11) To portions of the judge's charge, reciting same.

*Jos. B. Bredin,* for appellant.

*J. D. Marshall,* with him *Thos. H. Greer,* for appellee.

OPINION BY RICE, P. J., October 8, 1900:

The statute authorizes the granting of a divorce, (*a*) "when any husband shall have by cruel and barbarous treatment endangered his wife's life," or (*b*) "offered such indignities to her person as to render her condition intolerable and life burdensome, and thereby force her to withdraw from his house

and family." The defendant's first five points were intended to draw from the court positive and unqualified instructions that if husband and wife were not occupying the same habitation at the time of the alleged indignities she cannot obtain a divorce for the second cause above specified. This, it seems to us, puts a too literal construction on the words " thereby force her to withdraw from his house and family." Mr. Justice Coulter in delivering the opinion of the Supreme Court in Elmes v. Elmes, 9 Pa. 166, said on the subject of indignities to the person of the wife by her husband : " To render the condition of a wife intolerable, and her life burdensome, it is not necessary that there should be blows, or cruel and barbarous infliction of batteries that endanger her life. There may be without that such indignities to her person as to render her life a burden." So also it was said in May v. May, 62 Pa. 206 : " It is true, that such a course of treatment as would render the wife's condition intolerable and her life burdensome might, in the end, impair her health and shorten her life, but there are indignities to the person which would not seriously endanger her life though they would render it too humiliating and burdensome for her. to bear." But it is unnecessary in this connection to declare what course of conduct would constitute such indignities to the person of the wife as would render her condition intolerable and life burdensome. The proposition under discussion assumes that even though the wife were subjected to such a course of conduct—such a course of humiliating insults and annoyances, practiced in the various forms which ingenious malice could readily devise—as might, and actually did render her condition intolerable and life burdensome, yet she could not obtain a divorce for this cause, if at the time the indignities were inflicted upon her she and her husband were occupying separate habitations. By the same literal interpretation she could not obtain a divorce if he had no house and family. A case is supposable where the wife living apart from her husband might be subjected to such a course of conduct as has been described in the decided cases, and thereby be forced to refuse to dwell with him. In such a case her refusal to live with him would be justifiable, and in effect and in the contemplation of the statute would be a withdrawal from him. Whether or not the evidence in the present case as to the de-

fendant's conduct after December 11, 1895, came up to the requirements of the statute as interpreted by the decisions may, perhaps, be questioned. But as none of the assignments of error distinctly raises that question, we neither discuss nor express a decided opinion on it. We hold simply that the fact that a wife was living apart from her husband at the time of the alleged indignities is not per se and under all circumstances a conclusive bar to a divorce for the cause under discussion.

But although there was no reversible error in the answers to the points above referred to we are of opinion that there was error in some of the instructions contained in the general charge. We take the instructions complained of in the sixth, seventh and eighth assignments for illustration.

The facts referred to in the excerpt from the charge embraced in the sixth assignment of error were undoubtedly proper for the jury's consideration. Their significance, however, depended very much on the defendant's motive and the effect upon the plaintiff. Upon cross-examination the plaintiff described these occurrences as follows:

" Q. You say further that he came to your house at different nights and knocked on the door and knocked on the window and thereby annoying you; how often did he come and knock on your door? A. Indeed, I couldn't tell how often; he just came about the house at night; he was working in the oil country there, and passing back and forward, and he would stop and call. Q. Did he come and knock at your door over three times? A. Yes, sir, more than that. Q. Was it over six times? A. Perhaps not over six; I couldn't tell you how many times. Q. At these times you didn't open the door? A. No, sir. Q. And as the door wasn't opened he went away? A. He did sometimes come in in daylight. Q. I am asking when he came at night and knocked at the door, what happened? A. I don't remember of him coming in. Q. Didn't you occupy the kitchen? A. We did. Q. Didn't he as a fact for a couple of years there, wisely or foolishly, try to get you to go back and live with him? A. Yes, sir, he wanted me to go back. Q. Didn't he try to persuade you? He didn't even come there and offer to give you a licking? A. I don't know that his object was to persuade me to go back. Q. At the most it couldn't have been

any more than your imagination what he wanted to do if he got in? A. I know he was forbidden, and I know he was not wanted, and he knew he was annoying all of us and he has never made the least provision to have the children with him or asked to see them when he comes there. Q. Anyway he made no threats or never offered to strike you? I am asking when he came there at night if he ever offered to strike you, if he called you names or done anything more than knocking at the door and then if he didn't go away? A. Yes, sir, he went away. Q. And the most of that was an annoyance to you? A. Yes, it was an annoyance."

The defendant described them as follows: "Q. You were in the habit of coming to the house in the night-time after they came to the farm? A. No, sir. There was one occurrence I have forgotten, the occasion my wife has spoken of when I came there; I had gone to Greenville and on my way home I had bought a pony with saddle and bridle, and it occurred to me it would be a nice thing for the boys, and I rode it down to the house; I didn't get there until after night and I had to rout them up to take charge of the pony. Q. Were you back afterwards? A. Yes, sir, on four or five other occasions I rapped at the door like any neighbor; when no one would admit me I would go and tap on the window to call attention and very often one would talk to me. Q. That was a frequent occurrence? A. No, sir, it was not; it would be five or six times."

. If he went to his wife's house merely for the purpose of seeing his children or of inducing his wife to become reconciled to him, his action, however ill-advised, was entitled to a different construction in the determination of the question at issue from what it would justly receive if it proceeded from hatred, revenge and spite, and was resorted to for the purpose, and had the effect, of terrorizing and humiliating her. The mere fact that it "annoyed and disturbed" her would not convert this action of the defendant, if innocently intended, of which the jury was to judge, into an indignity to the person of the wife within the true intent and meaning of the divorce laws. Moreover not every indignity to the person, although annoying and disturbing, which falls short of rendering the wife's condition intolerable and her life burdensome is sufficient to entitle her to a divorce. As we have suggested, the court committed no

error in submitting these facts to the jury as part of the defendant's course of conduct—as circumstances tending to establish the general charge—but we are of opinion that, in declaring what legal effect the jury ought to give to them standing alone, the learned judge went farther than was warranted. Even if the defendant's action in calling at his wife's house annoyed her, it was susceptible, under the evidence, of another construction than that which was put upon it in the charge.

The defendant's act referred to in the ninth assignment of error, if done under the circumstances and in the manner testified to by the plaintiff, was an indignity to her person. But it is well settled that a single indignity of the character of that described in this assignment is not sufficient of itself to entitle the libellant to a divorce. In a case where the divorce was applied for on the ground of indignities to the person, and the proof was that the husband had pulled his wife's nose "in rudeness and in anger, in a coarse, vulgar and harsh manner," the court charged that this was sufficient to entitle her to a divorce. This was held to be error. The Supreme Court said: "It is not of a single act that the law speaks in the clause under which this case falls, but of such a course of conduct or continued treatment as renders the wife's condition intolerable and her life burdensome:" Richards v. Richards, 37 Pa. 225. The same principle has been recognized in later cases, amongst which may be mentioned May v. May, 62 Pa. 206, Nye's Appeal, 126 Pa. 341, and Mendenhall v. Mendenhall, 12 Pa. Superior Ct. 290. See also Edmond's Appeal, 57 Pa. 232, and Hardie v. Hardie, 162 Pa. 227.

In passing on the eighth assignment it is important to notice that on March 11, 1895, the plaintiff filed a libel, which, as amended on December 11, 1895, alleged substantially the same cause for divorce as that alleged in the present libel. Evidence was taken on both sides, and after a full hearing the court refused the divorce and dismissed the libel. Prior to the time of the filing of the first libel the plaintiff left the defendant and from that time refused to live with him. Before submitting the present case to the jury the court struck out all testimony relating to the conduct of the defendant prior to the date of the amendment of the first libel (December 11, 1895) upon the ground, as stated in the order, that the former decree was a

conclusive adjudication of the matters occurring before the date last mentioned. The correctness of this ruling is not now before us, but whether the evidence as to the prior conduct of the defendant was admissible on the trial of present libel or not, we think it clear that the former decree was a conclusive adjudication of the insufficiency of his acts prior to December 11, 1895, to justify a divorce. See 5 Am. & Eng. Ency. of Law (1st ed.), 847. It would also seem that it was impliedly an adjudication that the plaintiff was not legally justified in leaving her husband at the time she did. For it is well settled that separation is not to be tolerated for light causes, and all causes are light which the law does not recognize as ground for the dissolution of the marriage bond: Mendenhall v. Mendenhall, 12 Pa. Superior Ct. 290, and cases there cited. Granting even that the justifiableness of the plaintiff's leaving and refusal to live with her husband was an open question, which was to be determined upon all the evidence both as to what occurred before the former decree as well as to what occurred afterwards, its determination had an important bearing upon the fact of the defendant's refusal to support her. It has been held, it is true, that to deprive the wife of food or other necessaries of life is, under some circumstances, an indignity to her person: Mason v. Mason, 131 Pa. 161. But surely it cannot be contended that if she has deserted him without justifiable cause his refusal to support her afterwards, she still persisting in her separation from him, is an indignity to her person which entitles her to a divorce. We need not discuss that proposition, and if it cannot be sustained, as it clearly cannot be, there was error in the instructions complained of in this assignment. The effect of the instructions was that, if the defendant was not prevented by sickness and distress, his refusal to provide his wife and family with food and other necessaries of life after the date of the former decree was an indignity to her person, and if persisted in entitled her to a divorce. This entirely left out of view the undisputed fact that she had withdrawn from him and persisted in her separation against his wish. Under such circumstances his failure to support her in a separate establishment was not such an indignity to her person as, standing alone, entitled her to a divorce. If he had refused to receive her back, thus virtually "turning her out of doors"

(Grove's Appeal, 37 Pa. 443), an entirely different question would be presented.

It is unnecessary to discuss the several assignments of error further in detail. We have passed on the principal questions raised by them, and sufficiently indicated our conclusions.

The decree is reversed and a new trial awarded.