# Gordon, Appellant, *v.* Gordon.

*Divorce—Desertion—Evidence—Province of court and jury.*

On the trial before a jury of a libel for divorce for desertion by a wife against a husband, the plaintiff is entitled to have the case submitted to the jury where the evidence shows that after a summer vacation the respondent did not return to his home with his wife, alleging illness ; that he wrote her a year afterwards still referring to his illness and saying that he desired to consult her about a place where they could live together; that three months after the date of this letter to which the wife did not reply he sent a registered letter in which he again referred to his health, and stated that he had rented apartments, and asked when he could see her to fix and arrange for moving in ; that the respondent's statements as to his health were not true, and that the general tone of the letters and the circumstances under which they were written tended to show deception and bad faith.

Argued Dec. 12, 1902. Appeal, No. 140, Oct. T., 1902, by plaintiff, from judgment of C. P. No. 1, Phila. Co., June T., 1900, No. 1, on verdict for defendant in case of Phebe B. Gordon v. Charles M. Gordon. Before BEAVER, ORLADY, SMITH, W. W. PORTER and W. D. PORTER, JJ. Reversed.

Libel for divorce for desertion by a wife against husband. Before BIDDLE, P. J.

The facts are stated in the opinion of the Superior Court.

The court gave binding instructions for defendant.

Verdict and judgment for defendant. Plaintiff appealed.

*Error assigned* was in giving binding instructions for defendant.

*Thomas Earle White*, with him *A. S. L. Shields* and *Richard P. White*, for appellant.—The case was for the jury: McClurg's Appeal, 66 Pa. 366 ; Kinsey v. Kinsey, 1 Yeates, 78 ; Hollister v. Hollister, 6 Pa. 449 ; Fishli v. Fishli, 2 Littell's Rep. 337 ; Breinig v. Breinig, 26 Pa. 161 ; May v. May, 62 Pa. 206 ; French-Brewster v. French-Brewster, 62 Law Times, 609.

*John G. Johnson*, for appellee.—In the cases to which the ap-

pellant refers, there were complications of cruel and barbarous treatment and evidence of declarations by the husband justifying a finding of fact adverse to the bona fides of his efforts. In the present case there was an absolute lack of any such testimony. Nothing was before the court saving the letters and testimony which the appellant presented. This evidenced, without qualification, conduct of the husband which negatived any idea of continued malicious desertion.

OPINION BY W. D. PORTER, J., October 5, 1903:

The plaintiff, on February 23, 1900, filed her libel, alleging as the grounds for a divorce a wilful and malicious desertion by her husband during the period of two years and upwards. The respondent filed an answer denying the allegation of the libel, and demanding a jury trial. An issue was framed, under which the question to be determined by the jury trial was: "Did the said Charles M. Gordon on the fifteenth day of November, A. D. 1897, wilfully, maliciously, and without a reasonable cause, desert the libellant, Phebe B. Gordon, and absent himself from her habitation and continue in said desertion during the space and term of two years and upwards, from the said fifteenth day of November, A. D. 1897?"

After the evidence produced by the plaintiff had been concluded at the trial, the respondent declined to offer any testimony, and under peremptory instructions by the learned judge of the court below a verdict was had in favor of the defendant in the issue.

The evidence which the court below deemed insufficient to support the libel established the following facts:

The parties were legally married on April 21, 1891, and from that date until September, 1897, lived together and cohabited in the relation of husband and wife, in Philadelphia, in which city each of them still continues to reside.

While they thus lived together the relation of the husband and wife had been happy and amicable, but the feeling between the wife and some of the relatives of the husband had not been entirely friendly. The home of the parties was at No. 1502 North Seventeenth street, Philadelphia, but during the summer of 1897 that house was temporarily closed and they lived with a sister of the libellant in a cottage at Atlantic City.

The respondent was taken sick in the latter part of August, 1897, and physicians were called to attend him, his condition seemed to improve and he was able to visit Philadelphia, returning the same evening, and they remained at Atlantic City until the 8th of September, the cottage being kept open for their convenience after the owners had returned to Philadelphia. On the day last named, the respondent again went to Philadelphia, it being understood that he was to return the same evening, but his condition becoming worse while he was in the city, he went to the house of his mother; his wife was notified of that fact and immediately hurried to his side and assisted in nursing him. A professional nurse was called in on September 10, upon the advice of the physicians, who also directed that all persons other than the nurse should temporarily refrain from entering the patient's room.

The libellant had the home on Seventeenth street opened and put into condition for the reception of her husband as soon as his condition might permit of his removal. The trained nurse continued to take care of the respondent for about five weeks, during which period his condition steadily improved, and in October there was nothing in his mental or physical condition, if the testimony of the nurse and physicians is to be believed, which could or ought to have interfered with his returning to his wife and home.

He went for a brief period to Spring Lake, N. J., in order to have the benefit of outdoor exercise, refusing to permit his wife to go with him, although she entreated him to do so. The reason which he gave for his refusal was, that he was going to a farmhouse and there would be no room for his wife, whereas in fact, he went to a boarding house where guests were regularly entertained, and there would have been ample accommodation for his wife. The wife sent a most kindly letter to her husband by a mutual friend who was going to Spring Lake, but the defendant not only refused to write in reply, but when the friend questioned him, refused to send a verbal message to the libellant, and intimated that there was some reason of which the wife was aware which justified the treatment to which she was being subjected. The wife herself went to Spring Lake to see him, and he refused to permit her to procure a room in the same house and remain over night.

When the respondent returned from Spring Lake, in November, he went to reside at the house of his brother on Pine street, and the evidence in the case indicates that he has lived there ever since. The day after said return to Philadelphia, he wrote to his wife announcing that fact, and requesting her to call to see him the next afternoon at four o'clock. The wife called as requested on Saturday, November 13, 1897. The husband then announced that he desired to quit housekeeping and go to boarding, that his wife had not treated his friends properly, and complained of her conduct towards himself. They agreed to meet on Monday, November 15, 1897, at their own house on Seventeenth street, and there talk over their future plans. When they met pursuant to this engagement, the manner of the husband was most unkind and dictatorial, but they separated with the understanding that they would abandon housekeeping and the respondent would find a place for them to board.

This was the last that the wife saw of her husband. He wrote to her on the 18th of the same month, saying that because of the return of certain symptoms of his late illness, he could not place himself in a position where he would be subjected to anything disquieting and annoying; that his safety and hope of permanent restoration to mental vigor required that he remain where he was, and that for these reasons he would "drop making any arrangements for the present in the line of our interview of Monday."

If the testimony of the witnesses at the trial is to be believed, these alleged reasons of the respondent for continued separation from his wife were not founded in fact. This man, to whom quiet and the absence of excitement were so essential, attended a football game at Franklin Field two days after this letter was written. The wife replied to this letter, saying that their home was ready and waiting for the respondent, that she was alone in it, and ready and anxious to do and care for him as she had done all of their married life; and that she could not understand his actions in keeping away from her. The husband's reply to this wifely communication was not only unkind and without semblance of affection, but if the testimony of the libellant and Emma Nickum, the nurse, is true, his reply contained allegations which were absolutely false.

The libellant kept their home open for six months, and the husband never called there, sent her no message, and, although attending to business, and, going about as well men ordinarily do, absolutely ignored and abandoned his wife and all her interests. The wife, after keeping the house open, hoping for the return of her husband during six months, gave up the long wait. Being a woman of independent fortune, she did not have to call upon her husband for financial assistance, and, broken in health, subsequently made her home with her sister on North Broad street.

One year after the last interview between the husband and wife, the former sent the latter a cold, businesslike letter, saying: " I have now sufficiently recovered my health to justify my considering the subject of our again resuming domestic relations, while I still have occasional recurrences of pains in the head, yet the doctors say that these will steadily diminish in frequency and severity and ultimately entirely pass away, though they admonish me of the need of constant care. I would like to talk with you over the matter of plans for our future living together and wish you would appoint some time and place for this purpose."

Here is the same pretense of a reason for his prolonged abandonment of his wife, that it was required by the condition of his health, which he had alleged a year earlier, and which his own conduct in the interval and the testimony of the physicians who attended him, clearly indicate to have been without reasonable foundation. The reference to the recurrence of pains in the head and the allegation that the doctors still admonish him of the need of constant care, show the extreme caution of the writer; for he thus kept open behind him a door of retreat in case the wife showed any disposition to accept any proposition which he might subsequently make for the resumption of marital relations. This letter was written November 14, 1898, and a letter which the husband subsequently wrote, shows that he then believed that his wife was living in their old home on Seventeenth street, yet instead of making an effort to see her, he sent her a formal written proposition that they meet for the purpose of talking over plans for living together in the future. The wife did not reply to this letter, and the husband, perhaps encouraged by her silence

to believe that he could safely make a definite proposition for the resumption of marital relations, wrote on December 3, 1898, indicating that he desired to consult his wife over the selection of a suitable boarding place for them, and stating that if she did not do it, he would himself choose a place where they would take up their abode. The wife did not act upon this letter and the husband made no further move for over three months. He sent to his wife a registered letter, on March 11, 1899, notifying her that he had rented apartments, and asking when he could see her to fix and arrange for moving in. This letter again referred to the improving physical health of the respondent, and the entire later correspondence on the part of the husband keeps up this pretense of an excuse for his conduct, and seems to have been intended to give the impression that he had been acting under the advice of the very physicians who testified at the trial that there was nothing in the condition of the health of the respondent which made it necessary that he should forsake the society and abandon the interests of his wife.

The formal, written propositions which the wife received suggesting that the parties resume marital relations were thus permeated with deceit; the wife could not have been other than conscious of the attempted deception. The allegation by the respondent that his condition still required the exercise of constant care, was a warning to the wife that the husband still intended to keep open that avenue of escape from his marital duties, testimony in the case indicating that when the husband wrote the letter of November 14, 1898, he had been a well man and had not seen either of his doctors for many months, and yet he wrote as if he were then in present communication with them. The wife replied to the letter of March 11, 1899, stating in effect that in view of the past conduct of her husband, and the form and substance of his communication, she did not believe his proposition with regard to a resumption of marital relations was made in good faith, and that she could not accept it.

Careful consideration of the evidence has lead us to the conclusion that the whole case, including the good faith of the offer of the respondent was for the jury. The learned judge of the court below assumed that the defendant had been a vic-

tim of mental aberration, and that as soon as he was restored to his normal mental condition, he offered to resume marital relations. The vice of this assumption was in the fact that there was absolutely no evidence that the defendant was mentally irresponsible, and if such evidence had been produced the question was for the jury. The good faith of the defendant was, under the evidence, a question of fact to be determined in the manner provided by law: Hollister v. Hollister, 6 Pa. 449; Richards v. Richards, 37 Pa. 225; Breinig v. Breinig, 26 Pa. 161; McClurg's Appeal, 66 Pa. 366.

The defendant having demanded a jury trial, it was not only his right but that of the libellant, that the jury should pass upon all questions of facts involved in the issue and fairly arising under the evidence.

The judgment is reversed and a venire facias de novo awarded.