## Augenstein, Appellant, *v.* Augenstein.

*Divorce—Cruel and barbarous treatment—Condonation.*

1. Where a husband has subjected his wife to a long continued course of illtreatment amounting to indignities to the person, rendering her condition intolerable and her life burdensome, she will not be deprived of her right to divorce, merely because she condoned his illtreatment of her by resuming marital relations with him for a time until he again began to illtreat her; nor will her right to divorce be defeated because she was not actually forced to withdraw from his house and family, inasmuch as he had deserted her.

2. Where a wife is forced by the cruel and barbarous treatment of her husband to withdraw from the rooms they occupied, and to live in another part of the same house, she has been forced "to withdraw from his house and family," within the true intent and meaning of the act.

Argued Oct. 21, 1910. Appeal, No. 136, Oct. T., 1910, by plaintiff, from decree of C. P. No. 3, Phila. Co., dismissing libel for divorce in case of Fanny Augenstein v. Joseph Augenstein. Before RICE, P. J., HENDERSON, MORRISON, ORLADY, HEAD, BEAVER and PORTER, JJ. Reversed.

Libel for divorce.

The case was referred to Frank M. Wirgman, Esq., as master, who reported in favor of granting the divorce. The court, however, overruled the master's finding, and dismissed the libel, filing the following per curiam opinion:

In this case the ground for the divorce alleged in the libel is that the respondent has offered such indignities to the person of the libelant as to render her condition intolerable and life burdensome, thereby compelling her to withdraw from his home and family. The evidence discloses conduct on the part of the husband which might justify a finding that he had offered indignities to the person of the libelant, but there do not appear to have been such offenses against the libelant's person as to render her condition intolerable because, notwithstanding his misconduct in New York and the fact that he deserted her there, she followed him to Montreal, where relations were resumed. The indignities, so called, continued in Montreal, and he deserted her again while living in that city. After a period of time she discovered that he was living in Philadelphia, to which place she followed him, and the indignities continued, until about August 28, 1909, when the respondent deserted the libelant and never returned.

Whatever the conduct of this man, the libelant seems to have been willing to put up with it, and the only thing she did not willingly endure was a desertion on his part, because each time he left her, until the last time, she followed him. The testimony shows and the master reports that the respondent finally left the libelant and never returned to her. The ground alleged in the libel is not desertion, nor could it be, because the libel was filed about a month after the separation took place. Under the circumstances we cannot see how the libel can be sustained. The findings and conclusions and recommendations of the master are therefore not approved, and the libel is dismissed.

*Error assigned* was decree dismissing the libel.

*David Phillips*, with him *John Monaghan*, for appellant, cited: Sonricker v. Sonricker, 39 Pa. Superior Ct. 652; Mason v. Mason, 131 Pa. 161; Hill v. Hill, 32 Pa. C. C. Rep. 466; Burns v. Burns, 38 Pa. Superior Ct. 221; Hollister v. Hollister, 6 Pa. 449; Doan v. Doan, 3 Clark, 7; Breinig v. Breinig, 26 Pa. 161; Preston v. Preston, 11 Pa. Dist. Rep. 97.

No printed brief for appellee.

OPINION BY RICE, P. J., March 3, 1911:

The ground for divorce, alleged in the libel, is that the respondent has offered such indignities to the person of the libellant as to render her condition intolerable and life a burden, thereby compelling her to withdraw from his home and family. The parties were domiciled in the city of New York at the time of their marriage (August, 1897), and continued to reside at different places in that city until he deserted her, leaving her and their two infant children without money or means of support. During their residence in New York he beat her severely, swore at her frequently, and called her by the most opprobrious names on many occasions. Speaking generally, without going into further detail, he subjected her to a course of treatment which, had it occurred in Pennsylvania, would have justified her in leaving him and applying for a divorce. For a time after he deserted her she received assistance from a brother, and tried unsuccessfully to have one of the children taken by the board of charities, she thinking that she could earn enough to support the other child. Learning that the respondent was in Montreal, Canada, she went there, taking their two children with her, and, upon his promise that he would do better, went to live with him in a single room, the furniture for which was given to her by some of her friends. They lived in Montreal about three years, she helping to support the family by taking in sewing, and he being idle much of the time, although he could have got work at his trade and

was able to work.   Notwithstanding his promise, he sub-
jected her to the same kind of abusive treatment as he
had in New York, and finally deserted her again, leaving
her without money or food, and came to Philadelphia.
What occurred after that can be best described by quot-
ing her testimony.   "He did not say good-bye or tell me he
was going; he just left and did not come back again, and
I did not know where he was.   We had lived in Montreal
about three years.   Several months after he left, a family
named Effler, living here in Philadelphia, wrote me, say-
ing that my husband was in Philadelphia, and I should
come here if I wanted to find him.   So on June 15, 1907, I
brought my two children and came to Philadelphia, and
I found my husband boarding at 249 Queen street, but
he was staying most of the time at 402 Bainbridge street,
and he was working for Mr. Bookmeyer.   I asked him why
he went and left us there in Montreal, and he said, 'What
has been is all past and over, and now we will try it again,
and I will get work and will be better.'   So I gave him an-
other chance, and thought he might be better, and we took
two rooms from Mr. Fleischer, 726 Passyunk avenue,
Philadelphia, and I lived there with my husband for about
two years.   During that time I helped my husband along,
and I made the living.   I took skirts to finish and to sew on
hooks and eyes.   I made three and four dollars per week.
My husband would not work.   Sometimes he would work
a day, and then not work again for five or six weeks.   I
kept the home and we managed to live some way.   I would
buy stale bread, and instead of drinking milk I would give
the children weak tea, and in that way I managed to keep
the home and feed us all.   My husband did not support
me, even while we were living together.   I had to keep
him, and if I would ask him for some money to buy the
children shoes or clothing he would curse me and would
hit me.   One day I asked him to get the little girl a pair of
shoes, and he flew into a rage and came at me and knocked
me over backwards.   He came so suddenly that I did not
have a chance to get out of his way, and I fell on the floor

on my back, and I was dazed and could not get up, and he then came and jumped on me and kicked me with his shoes in the sides and the stomach. He kicked me a number of times. I have pains ever since from those kicks. I tried to talk to him nicely, and would ask him to be better and to get work, but he would not do any better, he was just the same. About two weeks before he finally left me, one day he came in, and I asked him where he had been and why he did not get work instead of walking around the streets, and he said he did not have to walk around the streets; that he was in a café playing penuchle, and he said to me, 'Don't you like it?' I asked him where we were to get food to eat, and he got more angry at that, and he came over to me and punched me in the ribs, and I tried to talk to him and asked him not to get so excited and mad, and asked him what he was doing, and he said to me, 'You are a son of a bitch. Didn't you have a bastard?' And I looked at him to ask him what he meant, and he took his fist and struck me in the mouth and knocked one of my teeth out, and then after that he left me. I could not stand his treatment any longer and I was obliged to go into another part of the house, and he then finally left the house and went away. I was working for Mr. Fleisher, and have been working for him ever since." The testimony of the libelant as to the respondent's treatment of her in New York and in Philadelphia is corroborated, in important particulars, by that of Samuel Fleisher, with whom they lived in Philadelphia, and is uncontradicted. The master, who saw the witnesses and heard them testify, found that it was truthful, and the learned court did not find that it was not to be credited. We see no reason to doubt its truthfulness, or to doubt that the course of treatment described amounted to "such indignities to her person as to render her condition intolerable and life burdensome," within the true intent and meaning of the statute. The learned court below concedes that the evidence discloses conduct on the part of the respondent which might justify a finding that he had

offered indignities to the person of the libelant, but says that the offenses do not appear to have been such as to render her condition intolerable. As shown by other portions of the opinion, and the immediate context, this conclusion is not based on a finding that they were not truly described in the testimony, but on the fact that, notwithstanding his misconduct, she followed him and resumed marital relations with him.

We cannot give assent to this view. It is not a single act that the law speaks of in the clause under which this case falls; but of such a course of conduct as renders the wife's condition intolerable and her life burdensome: Richards v. Richards, 37 Pa. 225. This idea that a course of conduct or continued treatment may constitute indignities to the person, which render the wife's condition intolerable and her life burdensome, within the meaning of the clause, even though the ill treatment may not be such as to endanger her life or health, is elaborated and emphasized in May v. May, 62 Pa. 206, where the court said: "It is true, that such a course of treatment as would render the wife's condition intolerable and her life burdensome might, in the end, impair her health and shorten her life; but there are indignities to the person which would not seriously endanger her life, though they would render it too humiliating and burdensome for her to bear." The fact that the wife, who has been subjected to such a course of ill usage as is described in the case at bar, is impelled by her forbearing disposition, or her necessities, or the hope of her husband's reformation, to submit to it for a longer time than some other women might, or than any woman ought to be compelled to do, does not militate against the conclusion that her condition was intolerable. Nor would the fact that there was a reconciliation and a resumption of marital relations that had been broken off conclusively show that his previous treatment of her had not been such as to render her condition intolerable. The same creditable motives that impelled the wife to submit for a long time to it might also impel her, as the libelant in the present

case expresses the thought, "to give him another chance." In Hollister v. Hollister, 6 Pa. 449, one of the questions presented for decision was, as stated in the opinion of the court, "whether a reconciliation, after the abuse and ill treatment alleged in the libel, and subsequent cohabitation, is a remission of the offense, and a bar to a divorce, without proof of new outrages after the reconciliation." As we understand the case, it decided the question in the negative, at least so far as a divorce a mensa et thoro was concerned. The remarks of Mr. Justice COULTER to the effect that it is the duty of a wife to forbear long and to endeavor earnestly to reclaim her husband, and that, if she fail, the virtue of her patience and fidelity ought not to deprive her of the remedy which the law holds out to broken peace and ruined hope, might very pertinently be quoted and applied here. Even in those jurisdictions where it is held that the principles of condonation apply to cruelty and indignities to the person, they are held to apply with this proper qualification, that any conduct which, after a reconciliation of the parties, creates reasonable apprehension of personal violence, will revive the condoned cruelty. "The condonation having presumptively proceeded on evidence of a change of temper, acts which themselves fall short of cruelty may plainly show that no change did take place; and, though not of themselves sufficient evidence of danger to the injured party, may make the danger apparent, when connected with what went before:" 2 Bish. Marriage and Divorce, (6th ed.), sec. 58. The idea is very clearly expressed in a Louisiana case in this way: "If a woman forgives ill usage and returns to her husband on promises of good usage, she shall not afterwards obtain the protection and assistance of this court, if those promises have been faithfully kept, and she again leaves her husband from caprice; but if there are clear indications of a breach of those promises, and some actual ill usage, she is not bound to wait for extremities, as in the first instance, but may depart as soon as she finds the promises violated, and her husband re-

turning to his old bad habits. She has a right to judge of the future by the past; and the court will connect the whole of his conduct, in order to form a correct judgment: " Threewits v. Threewits, 4 Desaussure, (S. C.) 560. We need not further discuss this precise question, for the evidence of the respondent's course of conduct, after the parties resumed marital relations in Philadelphia, was sufficient to sustain the libel, even though the unwarrantable concession be made that by returning to him the libelant unconditionally condoned the ill usage to which he had subjected her in New York and Montreal. And surely, whatever effect be given to the fact that the libelant sought out the respondent and became reconciled with him, as a condonation of what had gone before, it can be given no effect by way of estoppel or mitigation in the consideration of his subsequent extreme ill usage.

But it is suggested that she was not forced to withdraw from his house and family, but he deserted her, and, therefore, one essential to a divorce, under the clause of the statute relating to indignities, is lacking. This suggestion is based on too literal an interpretation of the statute. By the same literal interpretation, she could not obtain a divorce for this cause if he had no house and family. "A case is supposable where the wife living apart from her husband might be subjected to such a course of conduct as has been described in the decided cases, and thereby be forced to refuse to dwell with him. In such a case her refusal to live with him would be justifiable, and in effect and in the contemplation of the statute would be a withdrawal from him:" Roth v. Roth, 15 Pa. Superior Ct. 192. So, if a long continued course of ill treatment, amounting to indignities to the person, rendering the wife's condition intolerable and her life burdensome, should culminate in a violent assault upon her, and then the husband should abandon their common dwelling before she were able to withdraw therefrom, she could not obtain divorce for this cause if the interpretation under consideration be adopted. We are not prepared to adopt an interpretation

of the words which would make his added desertion, under such circumstances, a conclusive bar to a divorce for indignities to the person. Moreover, it is not necessary to go that far in this case. The home of the parties consisted of two rooms in the dwelling house of another family. According to the testimony she could not stand his treatment any longer and was compelled to withdraw from these rooms and abide in another part of the house, "and," to quote her testimony, "he then finally left the house and went away." This proof was sufficient to bring the case within the words, "and thereby force her to withdraw from his house and family," construed according to their true intent and meaning.

The decree dismissing the libel is reversed, and the record is remitted to the court below with direction to enter a decree of divorce a vinculo matrimonii in favor of the appellant, with costs.